In re **ALYUCAN INTERSTATE CORP., Debtor.**

**BANKERS LIFE INSURANCE COMPANY OF NEBRASKA, Plaintiff,**

v.

**ALYUCAN INTERSTATE CORP. and Stewart L. Grow, Jr., Defendants.**

**Bankruptcy No. 81–00089.**

**Civ. No. 81–0383.**

United States Bankruptcy Court, D. Utah.

July 16, 1981.

Anna W. Drake, Roe & Fowler, Salt Lake City, Utah, for debtor.

William Thomas Thurman, McKay, Burton, Thurman & Condie, Salt Lake City, Utah, for trustee.

Kim R. Wilson and A. Dennis Norton, Snow, Christensen & Martineau, Salt Lake City, Utah, for Bankers Life Ins. Co. of Nebraska.

## INTRODUCTION AND BACKGROUND

RALPH R. MABEY, Bankruptcy Judge.

This case raises the question whether an "equity cushion" is necessary to provide adequate protection under 11 U.S.C. Section 362(d)(1).[1] This Court concludes that it is not.

On January 14, 1981, Alyucan Interstate Corporation (debtor), a construction and real estate development firm, filed a petition under Chapter 11 of the Code. On May 4, Bankers Life Insurance Company of Nebraska (Bankers Life), holder of a trust deed on realty owned by debtor, brought this action for relief from the automatic stay under Section 362(d). The complaint alleges that the realty secures a debt in the principal amount of $1,220,000 and that Bankers Life is not adequately protected. On May 20, the preliminary hearing contemplated by Section 362(e) was held. After receiving evidence, the Court fixed the value of the realty on the date of the petition at $1,425,000 and found that there had been no erosion in that value as of the hearing. The debt owing was $1,297,226 as of the petition, and with interest accruing at roughly $8,000 per month, had increased to $1,330,761 as of the hearing. Thus, there was an "equity cushion" of $127,774 or approximately nine percent of the value of the collateral, as of the petition, which had decreased to $94,239, or approximately six and one half percent of the value of the collateral, as of the hearing. As interest accumulates, and if no payments are made, this cushion will dissipate within a year.

## THE MEANING OF ADEQUATE PROTECTION

Section 362(d)(1) mandates relief, in some form, from the stay "for cause, including the lack of adequate protection of an interest in property." The only cause asserted in this proceeding is a lack of adequate protection.

Adequate protection is not defined in the Code. This omission was probably deliberate. Congress was aware of the turbulent rivalry of interests in reorganization. It needed a concept which would mediate polarities. But a carefully calibrated concept, subject to a brittle construction, could not accommodate the "infinite number of variations possible in dealings between debtors and creditors." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, 6295. This problem required, not a formula, but a calculus, open-textured, pliant, and versatile, adaptable to "new ideas" which are "continually being implemented in this field" and to "varying circumstances and changing modes of financing." *Id.* Adequate protection was requisitioned to meet these needs. Its meaning, therefore, is born afresh out of the "reflective equilibrium"[2] of each decision,[3] understood through analysis of the reorganization context and the language of Section 362(d).

### A. The Reorganization Context

Relief from the stay cannot be viewed in isolation from the reorganization process.

---

1. Other issues important to relief from stay litigation in this District, *e. g.*, the parameters of "cause," and the method and timing of valuation, are treated in another decision, *In re Curlew Valley Associates*, Bankr. No. 80–00876 (transcript of hearing) (D.Utah, April 3, 1981).

2. This phrase is coined in J. Rawls, A Theory of Justice 20–21 (1971) to describe a hypothetical deliberative process.

3. Not only is the concept kaleidoscopic, but also the circumstances to which it applies will change from creditor to creditor, and from hearing to hearing, or even as to the same creditor in different hearings. It follows, and Congress intended, that the outcome of a relief from stay hearing is not *res judicata* for any subsequent hearing. *See, e. g.,* Sen.Rep.No.95–989, 95th Cong., 1st Sess. 54 (1978).

Bankruptcy in general and Chapter 11 in particular are "procedural devices" for the rehabilitation of financially embarrassed enterprises. H.R.Rep.No.95–595, 95th Cong., 1st Sess. 10 (1977). The process presupposes dynamic rather than static uses of property and denouement in a plan which accommodates the many, not just the few.

■ The automatic stay, within this framework, is designed "to prevent a chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts." *Fidelity Mortgage Investors v. Camelia Builders, Inc.*, 550 F.2d 47, 55 (2d Cir. 1976). It grants a "breathing spell" for debtors to regroup. It shields creditors from one another by replacing "race" and other preferential systems of debt collection with a more equitable and orderly distribution of assets. It encourages rehabilitation: debtors may seek its asylum while recovery is possible rather than coasting to the point of no return; creditors, realizing that foreclosure is useless, may rechannel energies toward more therapeutic ends. *See, e. g., Hearings on H.R. 31 and H.R. 32 Before The Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st Sess., Ser. 27, Pt. 1, at 321–322, 490–491 (1975).

Although self-help and other unilateral recourse against debtors are forbidden, creditors are not left remediless. They may act through committees with professional assistance, often at the expense of the estate, or by seeking appointment of a trustee or examiner. Conversion to Chapter 7 and dismissal are options. Within certain time constraints, they may file a plan.

■ In short, the adequate protection vouchsafed creditors in Chapter 11 is interim protection, designed not as a purgative of all creditor ailments, but as a palliative of the worst: re-organization, dismissal, or liquidation will provide the final relief. During this interim, the policies favoring rehabilitation and the benefits derived from the stay should not be lightly discarded. Alternative remedies are available to creditors. Indeed, even relief from the stay need not mean termination of the stay. Section 362(d) provides for relief, *such as*[4] "terminating, annulling, modifying, or conditioning" the stay. Thus, relief may be fashioned to suit the exigencies of the case.

### B.   The Language of Section 362(d)

Turning from Chapter 11 at large to Section 362(d) in specific, several issues must be addressed. First, what is the "interest in property" being protected? Second, what aspects of the "interest in property" require protection? Third, from what is the "interest in property" being protected? Fourth, what is the method of protection?

■ *(1) What is the "interest in property" being protected?* The legislative history mentions only "the interest of a secured creditor or co-owner of property with the debtor" in connection with adequate protection. H.R.Rep.No.95–595, 95th Cong., 1st Sess. 338 (1977). Within these classes of creditors, however, "the interests of which the court may provide protection . . . include equitable as well as legal interests. For example, a right to redeem under a pledge or a right to recover property under a consignment are both interests that are entitled to protection." *Id.* This classification is important because adequate protection depends upon the interest *and* property involved. Protection afforded a lessor, for example, may be different from that afforded a secured creditor.[5] Treatment of a

---

4.   Although not defined in the rules of construction of the Code, "such as" is probably not limiting. *Cf.* 11 U.S.C. Section 102(3).

5.   As indicated above, lessors are not mentioned in the legislative history as being entitled to adequate protection. The Commission counterpart to Sections 361 and 362(d) protected lessors of personal but not real property. *See* Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93, Section 7–203 (1973). This drew criticism from some quarters, *see, e. g.*, Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1483, 1495–

secured creditor who faces turnover may be different from treatment of a secured creditor who has not repossessed.[6] Treatment of a senior lienholder may be different from treatment of a junior lienholder. Similarly, protection may vary if the property is real or personal, tangible or intangible, perdurable or perishable, or if its value is constant, depreciating, or subject to sudden or extreme fluctuations.[7] Also relevant is the proposed use or idleness of the property.[8]

■ *(2) What aspects of the "interest in property" require protection?* Adequate protection is concerned with the value of the interest in property. The legislative commentary to Section 361 underscores this point: "Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives *in value* essentially what he bargained for." *Id.* at 339. (Emphasis supplied.) The legislative history reemphasizes this point by noting that adequate protection is "derived from the fifth amendment protection of property interests," *id.,* citing *Wright v. Union Central Insurance Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940) and *Louisville Bank v. Radford,* 295 U.S.

1497 (1975), which may have prompted adoption of the "interest in property" language of Sections 361 and 362(d). In redressing one textual ambiguity, however, Congress may have overlooked another: are the rights and remedies provided a lessor under 11 U.S.C. Section 365 in addition to or in lieu of those which he may be granted under Section 362(d)? If Section 365 is nonexclusive, do its provisions for "cure" and "adequate assurance" differ from or affect the nature of adequate protection afforded under Section 362(d)?

6. *Cf. In re Alpa Corporation,* 11 B.R. 281, 7 B.C.D. 791 (D.Utah 1981). Does a showing of adequate protection become more difficult as the interest of the debtor or the estate in property becomes more tenuous, with maximum protection required where the debtor or the estate has a naked possessory interest in property?

7. The interest of the debtor or the estate in property may raise questions concerning the applicability of the stay as well as questions of adequate protection. For example, where a debtor is a tenant in a shopping center owned by a non-debtor who has defaulted on a mortgage to a third party, is foreclosure by the mortgagee subject to the stay? Similar problems arise where the debtor is a junior lienor on realty owned by a non-debtor who has defaulted on a mortgage to a third party. *See, e. g.,* P. Murphy, Creditors' Rights in Bankruptcy ¶ 6.04 at 6–11 (1980); Murphy, "Use of Collateral in Business Rehabilitations: A Suggested Redrafting of Section 7–203 of the Bankruptcy Reform Act," 63 Cal.L.Rev. 1483, 1498 (1975).

8. Other complications concerning this aspect of adequate protection are easily imagined but difficult to resolve.

(1) Classifying the "interest in property" for purposes of adequate protection analysis may be problematical. What, for example, of the holder of an overriding royalty interest in a mineral lease? Is he the owner of an "interest in property" which is protectible under Section 362(d)(1)? The natural resources lawyer will answer this query in the affirmative (although there may be disagreement whether the interest is personalty or realty). *See, e. g.,* 2 Brown, Law of Federal Oil and Gas Leases, Section 17.01 (1975); 2 Williams & Meyers, Oil and Gas Law, Section 418 (1977). The securities lawyer may say no on the ground that the interest is an equity investment. *See, e. g., SEC v. Joiner Leasing Corp.,* 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943). If so, is it entitled to adequate protection? Some authorities have concluded that unsecured creditors are not entitled to adequate protection and it is improbable that equity investors would receive better treatment. *See In re Garland Corporation,* 6 B.R. 456 (D.Mass., Bankr.App.Pan.1980) (unsecured creditors not entitled to adequate protection). *But see In re Boston & Me. Corp.,* 484 F.2d 369, 374 (1st Cir. 1973) (unsecured creditors have rights in property which are constitutionally protected in bankruptcy). *Cf. Louisville Bank v. Radford,* 295 U.S. 555, 588, 55 S.Ct. 854, 862, 79 L.Ed. 1593 (1935) ("It is true that the position of a secured creditor, who has rights in specific property, differs fundamentally from that of an unsecured creditor, who has none").

(2) In evaluating adequate protection, how much weight should be given to claims, whether or not litigated with the relief from stay action, *see, e. g., United Companies Financial Corp. v. Brantley,* 6 B.C.D. 178 (N.D.Fla.1980), which if established, could invalidate or subordinate the interest in property?

(3) Conceivably, several creditors could have various interests in the same property or various interests in different properties owned by the debtor or the estate. Granting relief from the stay to one creditor under these circumstances could result in a loss of adequate protection to other creditors. The implications of this dilemma are not readily fathomed. *See, e. g., In re Curlew Valley Associates, supra* note 1, at 1.

555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).[9] In *Wright*, Justice Douglas held that the bank received "the value of the [interest in] property" and that "there is no constitutional claim of a creditor to more than that." *Id.* 311 U.S. at 278, 61 S.Ct. at 199. Debtors were allowed to redeem the property at its appraised price, despite an obligation which exceeded the value of the collateral by $10,000. Thus, the "interest in property" entitled to protection is not measured by the amount of the debt but by the value of the lien.[10] A mushrooming debt, through accrual of interest or otherwise, may be immaterial, if the amount of the lien is not thereby increased, while vicissitudes in the market, loss of insurance or other factors affecting the value of the lien are relevant to adequate protection. The purpose of adequate protection is to assure the recoverability of this value during the hiatus between petition and plan, or in the event the reorganization is stillborn, between petition and dismissal.[11]

■ *(3) From what is the "interest in property" being protected?* The short answer is from any impairment in value attributable to the stay.[11a] The stay does not cause, but it may forestall a creditor from preventing or mitigating, a decline in value. Some harm to collateral, however, may be unavoidable with or without the stay. Likewise, creditors may acquiesce in some harm to collateral for business or other reasons notwithstanding the stay. In these situations, and others which may arise, any impairment in value may not be attributa-

---

**9.** The current standing of these precedents is unsettled. *Compare e.g., In re Rodrock*, 642 F.2d 1193 (10th Cir. 1981), *with In re Pillow*, 8 B.R. 404 (D.Utah 1980). *Cf.* Note, "Constitutionality of Retroactive Lien Avoidance Under Bankruptcy Code Section 522(f)," 94 Harv.L. Rev. 1616 (1981).

**10.** Lien is used herein as a shorthand expression for allowed secured claim under 11 U.S.C. Section 506(a). Where a creditor is undersecured, this is the value of the collateral. Where he is oversecured, it is the amount of the debt plus interest and other expenses if they accrue. *Compare* 11 U.S.C. Section 502(b)(2) *with* 11 U.S.C. Section 506(b). Whether and when interest on an oversecured claim should accrue is discussed in *In re Curlew Valley Associates, supra* note 1, at 1.

**11.** Some cases have interpreted adequate protection more in terms of contractual benefits than economic values. They have focused on language in the legislative history suggesting that secured creditors must receive the "benefit of their bargain." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 339 (1977). Congress, however, was not referring to the *contractual* bargain between creditors and debtors because the next portion of the House Report acknowledges "there may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section [Section 361] recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for." *Id.* Whether and to what extent noncontractual or business elements of a bargain may be factored into the adequate protection equation is problematical. Some courts, employing an equity cushion analysis (discussed below), insist that a ratio of debt to collateral is "bargained for" between debtor and creditor and must be considered in determining adequate protection. *See, e. g., In re Pitts*, 2 B.R. 476, 478 (C.D.Cal.1979) ("No secured creditor structures a transaction in such fashion that the value of the property equals the amount of his claim. The existence of an equity, in terms of collateral value in excess of the secured creditor's claim, is an elementary and fundamental part of the transaction"). The stream of inquiry along this path, however, may be difficult to contain. Many business motives, which may or may not be expressed in the documents memorializing a transaction, could then become relevant to adequate protection. As a practical matter, for example, foreclosure may not be an attractive prospect for some lenders who are, after all, in the business of loaning money not managing properties. Hence, their bargain is primarily for payment with interest and, as a last resort, for liquidation with its burdens of custodial care and costs. Foreclosure may likewise pose regulatory complications. Banks and insurance companies are traditionally limited in the amount of illiquid assets, such as realty, which they can carry at any given time in their portfolio. *See, e. g.*, 1B, Utah Code Ann., Section 7–3–30 (1971) and 4A Utah Code Ann., Section 31–13–17 and 31–13–18 (1974).

**11a.** In hearings pursuant to 11 U.S.C. Sections 363 and 364 the answer would be from any impairment in value attributable to the use, sale, or lease or grant of a lien on the interest in property. *See* 11 U.S.C. Section 361.

ble to the stay. Hence, not every decline in value must be recompensed, only those which, but for the stay, could be and probably would be prevented or mitigated.

■ *(4) What is the method of protection?* The method of affording adequate protection, as noted above, will vary with the interest in property to be protected. In some cases, the debtor [12] need do nothing, either because the value of the interest in property is not declining or because the decline in value is not attributable to the stay. If the stay is responsible for a decline in value, Section 361 states three illustrative methods for providing adequate protection. Some courts, however, have not looked beyond its trilogy of alternatives. Others have insisted on a showing of indubitable equivalence. These approaches miss the mark: they violate the non-prescriptive character of Section 361, and may simply exchange one imponderable for another. Indubitable equivalence is not a method; nor does it have substantive content. Indeed, something "indubitable" is more than "adequate;" "equivalent" is more than "protection;" hence, the illustration may eclipse the concept. At best, it is a semantic substitute for adequate protection and one with dubious, not indubitable, application to the question of relief from the stay. *See, e. g.,* 2 Collier on Bankruptcy ¶ 361.-01(1) at 361–4—361–5 (15th ed. 1980).

### C. Application to This Proceeding

■ In this proceeding, the "interest in property" is the lien of Bankers Life on the realty of debtor. It is a trust deed and therefore may be peremptorily foreclosed. *See* 6A Utah Code Ann., Sections 57–1–19 *et seq.* (1974). It is a first lien with ample

collateral to protect Bankers Life. The collateral and therefore the lien are not declining or subject to sudden depreciation in value. Bankers Life is suffering no pain cognizable under Section 362 as a result of the stay, and relief from the stay is therefore, at this juncture, unnecessary.

■ Moreover, this property is essential to the reorganization of the debtor. Foreclosure and liquidation of the property would run counter to this need and would deprive debtor and other creditors of its going concern value. If liquidation is allowed, it should occur under the aegis of the Court and in the interests of all. Bankers Life is no better qualified to handle this liquidation than the debtor or the trustee. Indeed, Bankers Life may be ill-equipped to undertake this task, both because its interests are parochial and because, for regulatory or other reasons, it may be a reluctant caretaker. *See* discussion *supra* note 11, at 7. In any event, Bankers Life has other remedies under the Code. A trustee has been appointed. It may work with him or with creditor committees to negotiate a sale of the property. It can seek dismissal or conversion to Chapter 7. It can propose a plan of liquidation. In short, the application of adequate protection to the facts of this case avoids the trauma of relief from the stay and maintains the equilibrium of interests in this reorganization.

### THE EQUITY CUSHION ANALYSIS

■ In contrast to these principles, there is a trend toward defining adequate protection in terms of an "equity cushion": the difference between outstanding debt and the value of the property against which the creditor desires to act. Where the differ-

---

12. The legislative history notes that the debtor-in-possession or trustee, not the court, must provide adequate protection. Otherwise, the court is forced into an administrative role at odds with the spirit of the Code. "If the party that is affected by the proposed action objects, the court will determine whether the protection provided is adequate." H.Rep.No.95–595, 95th Cong., 1st Sess. 338, 6295 (1977). Courts, however, have gone beyond this adjudicative function, and in some instances, have actively fashioned protection for creditors. *See, e. g., In the*

*Matter of Pleasant Valley, Inc.,* 6 B.R. 13, 17–18 (D.Nev.1980) (debtor ordered to pay taxes, assessments, and interest on specified terms and conditions and to provide insurance of specified kinds and amounts and deed of trust on additional property). This result may be inevitable given the exigencies and informalities of relief from stay proceedings. Indeed, it grows out of the language of Section 362(d) which mandates relief such as "modifying" or "conditioning" the stay.

ence is substantial, a cushion is said to exist, adequately protecting the creditor. As interest accrues, or depreciation advances, and the margin declines, the cushion weakens and the stay may be lifted.[13] Naturally, courts disagree on what is an acceptable margin.[14] The emerging view, however, may be that the stay should be terminated when the cushion will be absorbed through interest, commissions, and other costs of resale. The cushion analysis enjoys practical appeal and ease of application.

This Court rejects a cushion analysis upon four grounds: (1) It is inconsistent with the purpose of adequate protection. (2) It is inconsistent with the illustrations of adequate protection found in Section 361. (3) It is inconsistent with the statutory scheme

of Section 362(d). (4) It has no basis in the historical development of relief from stay proceedings.

(1) The cushion analysis, by focusing on the ratio of debt to collateral, obscures the purpose of adequate protection, viz., to guard against impairment of a lien. This blurring of objectives may produce improper results. If Bankers Life had been undersecured at the petition, for example, the absence of cushion would have dictated relief from the stay, even though the stay did not impair its lien and notwithstanding the usual appreciation in the value of realty.

(2) Since the thrust of adequate protection is to assure maintenance of the value of the lien, it is largely compensatory. Sec-

---

13. This, according to one commentator, is "perhaps the most important [line of] cases dealing with adequate protection." Schimberg, "Uniform Commercial Code Annual Survey: Secured Transactions," 36 Bus.Law. 1347, 1396 (1981).

14. The cushion analysis was first articulated in *In re Pitts*, 2 B.R. 476 (C.D.Cal.1979). The collateral, a home, was valued at $125,000, while the debt and costs of foreclosure and resale were fixed at $105,875, leaving a cushion of $19,125 or 15 percent. This was deemed "minimal," "fragile," and "precarious," but enough. The court emphasized the need for regular, periodic review in order "to avoid dissipation of whatever protection the cushion affords." *Id.* at 478 and 479. The fact that plaintiff was a junior lienholder and therefore would be "squeezed" as the senior lien accrued interest was not stressed, nor have later opinions discussed the significance of this point in terms of the cushion analysis or adequate protection. In *In re Hutton-Johnson Co., Inc.*, 6 B.R. 855 (S.D.N.Y.1980), a first lienholder on realty was undersecured at the date of the petition. The property was not depreciating in value. The court alluded to a bargained for debt-collateral ratio but noted "it does not follow that the concept of adequate protection is designed to put the secured creditor in the same position it was in when it initially negotiated the transaction." *Id.* at 860. This statement runs counter to language in *Pitts*. *See* discussion *supra* note 11, at 7. Nevertheless, the creditor's undersecured status, *ipso facto*, was deemed conclusive on the issue of adequate protection. In *In the Matter of Pleasant Valley, Inc.*, 6 B.R. 13 (D.Nev.1980) there was a 2.6 percent cushion. The court found that the land was not depreciating in value, but ruled that "nothing should be permitted which *reduces* plaintiffs' protection." *Id.* at 17 (emphasis in original). The court also ruled that a first lienholder on land would not be adequately protected unless debtor paid taxes, insurance, monthly interest, and gave added security. In *In re Tucker*, 5 B.R. 180 (S.D.N.Y.1980) a cushion of 7.4 percent was believed inadequate protection for a junior lienholder on realty, although other circumstances weighted the decision against debtor. In *In re Castle Ranch of Ramona, Inc.*, 3 B.R. 45 (S.D.Cal.1980), a cushion of 8.6 percent was held inadequate to protect a first lienholder on realty, although the opinion elsewhere suggests the absence of equity and is not straightforward in its application of a cushion analysis. In *In the Matter of Lake Tahoe Land Company, Inc.*, 5 B.R. 34 (D.Nev.1980) the court found that termination of the stay was appropriate for "cause" independent of the adequate protection issue. Although the lender was undersecured, the court noted in dictum that a 40 to 50 percent cushion for lenders on raw ground would be necessary to afford adequate protection. In *In re Rogers Development Corp.*, 2 B.R. 679 (E.D.Va.1980) the court held a 17 percent cushion for a first lienholder on land to be adequate protection. In *In re San Clemente Estates*, 5 B.R. 605 (S.D. Cal.1980) the court held a 65 percent cushion for a first lienholder on land to be adequate protection. The court noted that this "quantitative approach may have the salutary effect of giving precise guidance as to the standard to be used, but it does seem to be inconsistent with the Congressional intent that each case is to be judged on its facts." *Id.* at 610. The court further noted that if development projections were not met and the land had to be marketed in its present condition, this would require a new valuation of the property resulting in a 17 percent cushion which would be "precariously close to being inadequate." *Id.* at 611.

tions 361(1) and (2) therefore speak not in terms of preserving equity but in terms of compensating for any "decrease in the value of [an] interest in property."[15] Moreover, the cushion analysis, because it is confined to the relationship between debt and collateral in a specific property, ignores the recoverability of value, not only from the property at stake but also from other sources. Sections 361(1) and (2), which provide for interim payments and replacement liens, contemplate that value from other assets held by debtors may be appropriated to supply any needed protection. Indeed, the legislative history to Section 361 suggests the use of sureties or guarantors for this purpose. *See* H.R.Rep.No.95–595, 95th Cong., 1st Sess. 340 (1977). *But see In re Kenny Kar Leasing, Inc.,* 5 B.R. 304 (C.D. Cal.1980). Even if the debtor has no other assets, it is nevertheless conceivable that an enterprise valuation, which approaches value in terms of capitalized earnings, could show an income potential sufficient to meet the adequate protection standard.[16]

(3) Under Section 362(d)(2) a lack of equity, absent a further showing that the property is unnecessary to an effective reorganization, does not warrant relief from the stay. This statutory provision expresses a legislative judgment, first, that it is the *absence* of equity rather than any particular cushion which is the criterion for relief from stay, and second, that the absence of equity is not alone dispositive—the court must still weigh the necessity of the property to an effective reorganization. The cushion analysis is inconsistent with this judgment. It makes surplusage out of Section 362(d)(2) which speaks in terms of equity *and* reorganization. Indeed, this dual requirement emphasizes the role of equity, when present, not as a cushion, but to underwrite, through sale or credit, the rehabilitation of debtors.[17]

(4) The cushion analysis is alien to the development of stay litigation. The stay provisions in Chapter proceedings in the Act, former 11 U.S.C. Sections 714, 814, and 828, as implemented through Bankruptcy Rules 10–601, 11–44, and 12–43, allowed relief "for cause shown." This was interpreted to require consideration of a number of factors, including the presence of equity, the likelihood of harm to the creditor, prospects for reorganization, and essentiality of

---

**15.** Even Section 361(3), the indubitable equivalent standard, had its genesis in *In re Murel Holding Co.,* 75 F.2d 941 (2d Cir. 1935) where Judge Hand opined: "It is plain that 'adequate protection' must be completely compensatory." *Id.* at 942.

**16.** *See, e. g.,* Bonbright, Valuation of Property, Chapter XII (1937); Dewing, The Financial Policy of Corporations, Part II (5th ed. 1953); Blum, "Corporate Reorganizations Based on Cash Flow Valuations," 38 U.Chi.L.Rev. 173 (1970); Blum, "The Law and Language of Corporate Reorganization," 17 U.Chi.L.Rev. 565 (1950); Blum and Katz, "Depreciation and Enterprise Valuation," 32 U.Chi.L.Rev. 236 (1965); Gardner, "The SEC and Valuation Under Chapter X," 91 U.Pa.L.Rev. 440 (1943).

**17.** Sections 362(d)(1) and (d)(2) are separated by the disjunctive "or," which is defined in 11 U.S.C. Section 102(5) to mean "not exclusive." This suggests, as a number of cases have held, that (d)(1) and (d)(2) provide alternate criteria for relief from the stay. This conclusion, however, may be questioned on two grounds. First, the preface to (d)(2) speaks of stays of "an act against property." This suggests that (d)(2) may be the exclusive standard for relief from the stay where property is involved. This

suggestion is reinforced by legislative history which earmarks (d)(2) "to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure." 124 Cong.Rec. H 11,092–11,093 (September 28, 1978). Section 362(e) speaks even more specifically of "the stay of any act against property of the estate." Such particularized draftsmanship may connote a special distinction and purpose. The courts, however, have shown indifference on this score, and have applied (d)(1), which refers to adequate protection of an "interest in property," to relief from stay actions concerning property. Second, the legislative backdrop to "or" is illuminating: "Or" means "not exclusive," which in turn means "if a party 'may do (a) or (b),' then the party may do either or both." Sen.Rep.No.95–989, 95th Cong., 2d Sess. 83 (1978) as discussed in Klee, "Legislative History of the New Bankruptcy Law," 28 DePaul L.Rev. 941, 959 (1979). Does the court, then, have discretion to apply either (d)(1) or (d)(2) alone or both (d)(1) and (d)(2) together in determining whether relief from the stay is appropriate? And given the legislative history noted above, in the case of a foreclosure on realty, should the court ordinarily defer to (d)(2)?

the property in the operation of the estate. *See, e. g.*, Peitzman and Smith, "The Secured Creditor's Complaint: Relief from the Automatic Stays in Bankruptcy Proceedings," 65 Cal.L.Rev. 1216, 1226 (1977).

Although the "idea of equity" became "something of a totem for courts," *id.* at 1227, it was equity in the sense contemplated under Section 362(d)(2), not an equity cushion. Thus, it was acknowledged that "deciding whether to continue or vacate the stay solely on the ground of the debtor's equity in the property may produce an unjust result," for example where "the encumbered property is so vital to the operation of debtor's business that foreclosure will simply not be allowed." *Id.*

Similarly, another commentator describes the "operative equities" which are weighed in relief from stay actions, to include the debtor's need for the property, harm to the creditor, stage of the proceedings, and "how persuasive the indications are that the debtor can fabricate a plan susceptible of confirmation," but warns against "red herrings." "One of these is the oft mentioned concern as to how much equity the debtor has in property sought by a secured creditor. If the equity is large, that is the reason for granting relief [to the debtor] which might be denied if it were not. Yet, that judgment ought to be largely immaterial, since the equity can presumably be salvaged for the debtor in liquidation of the property as part of the administration of the estate or upon its surrender to the secured creditor, particularly where the court exercises its discretion to control the time and manner

of liquidation. It is submitted that the real determinants should be and probably are the factors just suggested. For example, if a debtor badly needs the property and its vital signs are strong, the size of its equity shouldn't have much bearing on the situation, although a large equity does make a decision favorable to the debtor more palatable for all concerned." Festersen, "Equitable Powers in Bankruptcy Rehabilitation: Protection of the Debtor and the Doomsday Principle," 46 Am.Bank.L.J. 311, 332–333 (1972).

Professor Kennedy, the leading commentator on stays under the Act, concurs with these views: "The existence of an equity is not ... and should not be, indispensable to the continuation of a stay. Congress explicitly authorized the bankruptcy court to enjoin lien enforcement when appropriate in the pursuit of the objective of rehabilitation under Chapter XI. If the secured creditor is adequately protected from injury resulting from the stay, the collateral is essential to the reorganization, and a reorganization in the interest of unsecured creditors is a realistic possibility, the absence of an equity should be immaterial. The presence or absence of an equity does not have comparable importance in Chapter X or a Chapter XII case, because it is at least theoretically possible for a plan confirmed under either of these chapters to reduce or otherwise alter the rights of secured creditors in the property subject to their liens." Kennedy, "The Automatic Stay in Bankruptcy," 11 U.Mich.J.Law.Ref. 175, 247–248 (1978).[18]

---

**18.** A further reason for rejecting the cushion analysis is tactical in nature. If the value of the interest in property at the date of the petition is the benchmark from which adequate protection is measured, *see In re Curlew Valley Associates, supra* note 1, at 1, creditors, logically, should argue for a high value which accentuates any decline in worth. The Commission Report, in contrast, noted that "a benchmark in determining the adequacy of protection is the liquidation value of the collateral at the date of the petition." Report of the Commission on the Bankruptcy Laws of the United States, H.Doc. No. 93–137, Part II, at 237 (1973). Creditor groups which testified at hearings on the bills incorporating the Commission propos-

als were unanimous in their criticism of this provision. *See, e. g.*, statement of John J. Creedon, Chairman, Subcommittee on Federal Bankruptcy Legislation, American Life Insurance Association, and statement of Robert J. Grimmig on behalf of the American Bankers Association, *Hearings Before the Subcomm. on Civil and Constitutional Rights of the House Comm. on the Judiciary*, 94th Cong., 1st Sess., Ser. 27, Pt. 1, at 1607 and 1754 (1976) ("The measure of protection in the case of a secured creditor should be the 'fair value' rather than the 'liquidation value' of his security"); ("The test should be the going-concern value of [the] security ... the value should be determined [as of] the time of the filing of the petition"). Us-

## CONCLUSION

Adequate protection is a concept designed to balance the rights of creditors and debtors in the preliminary stages of reorganization. It is, in each case, *ad hoc.* For this reason the cushion analysis, which may be helpful in general, falls short in the particular. It is not fully alert to the legislative directive that "the facts," in each hearing under Section 362(d), "will determine whether relief is appropriate under the circumstances." H.R.Rep.No.95–595, 95th Cong., 1st Sess. 344 (1977). The facts of each case, thoughtfully weighed, not formularized, define adequate protection.

ing a going concern value, however, would be at cross-purposes with the cushion analysis which argues for a value low enough to be swallowed by the debt.