**In re SEWANEE LAND, COAL & CATTLE, INC., Debtor.**

**SEWANEE LAND, COAL & CATTLE, INC., Plaintiff,**

**v.**

**Terry LAMB, Charles Bailey Rogers, and J. Edgar Hammonds, Defendants.**

**Bankruptcy No. 82–0550.**

**Adv. No. 82–0659.**

United States Bankruptcy Court, N. D. Alabama.

July 13, 1982.

Thomas J. Knight, Anniston, Ala., for debtors.

Leon Garmon, Gadsden, Ala., for defendants.

## INTRODUCTION

L. CHANDLER WATSON, Jr., Bankruptcy Judge.

The above-styled case was commenced by a voluntary petition filed in this Court under Chapter 11, Title 11, United States Code, on January 28, 1982, and the case is still pending before this Court under said Chapter 11.

The above-styled adversary proceeding was commenced by a complaint filed in this Court on May 21, 1982, by Sewanee Land, Coal & Cattle, Inc. (hereinafter referred to as the "debtor") against two of the creditors listed in the debtor's schedule of creditors, being J. Edgar Hammonds and Terry Lamb (hereinafter usually referred to as the "creditors") and a third person, Charles Bailey Rogers. The debtor's schedules show it to be substantially indebted only to said creditors, upon a promissory note for $850,000.00 secured by the real property involved in this litigation, and to its two stockholders, in the sum of $250,000.00 for the conveyance by them to it of their interest in said real property.

On May 24, 1982, the said J. Edgar Hammonds commenced an adversary proceeding against the debtor, by a complaint which seeks relief from the stay imposed under 11 U.S.C. Section 362(a), so as to permit the foreclosure of a lien upon land of the debtor.

By a stipulation between the attorney for the debtor and the attorney for the creditors, filed in both adversary proceedings on July 6, 1982, it was agreed that the adversary proceeding commenced by J. Edgar Hammonds, designated as AP 82–0667, would be dismissed out of court but that the plaintiff's complaint therein would be treated as a counterclaim in the above-styled adversary proceeding and that all discovery procedures in the proceeding to be dismissed would be transferred to the above-styled adversary proceeding and considered as discovery procedures therein. Accordingly, an order to that effect will be

entered in the adversary proceeding to be dismissed. No motion or answer has been filed by the debtor to the counterclaim, and as far as the Court is aware none has been served; however, all parties have treated this adversary proceeding as if the debtor had duly served and filed a general denial to the counterclaim, and the Court will do likewise.

Because of the time constraints for action by the Court upon the counterclaim, seeking relief from the stay imposed under 11 U.S.C. Section 362(a), this matter is being disposed of apart from that set forth in the debtor's complaint. The counterclaim was tried before the Court at Anniston, for part of the day July 6, 1982, with the trial concluded at Gadsden on July 7, 1982.

### FINDINGS OF FACT

From a due consideration of the evidence received, the bankruptcy judge finds the facts as follows:

1. On or about October 9, 1979, the creditors sold to Robert C. and Betty G. Tinsley (husband and wife) a tract of land which consists of more than 2,700 acres and mostly lies in Chattooga County, Georgia, just east of DeKalb County, Alabama, for the sum of One Million Dollars.

2. The purchase price was to consist of a down payment of $150,000.00, all or part of which was represented by a promissory note, and a promissory note in the sum of $850,000.00, secured by a deed of trust upon said land.

3. Said land was subject to a lien, created by a deed of trust from the creditors and Charles Bailey Rogers to the Third National Bank in Nashville (Tennessee), securing the creditors' debt to said bank in the sum of $282,000.00, due June 1, 1982, which indebtedness the purchasers did not assume and which was to be paid by the creditors.

4. At the time of trial, the Tinsleys owed approximately $80,000.00 on the promissory note for the $150,000.00 down payment; however, the creditors had discounted the note for $10,000.00, receiving $69,000.00, at a bank in Pell City, Alabama, where the Tinsleys reside.

5. The promissory note given by the Tinsleys to the creditors for the balance of $850,000.00 of the purchase price bears interest at the rate of 10% per annum. It provided that interest only was to be paid on October 9, 1980 and on October 9, 1981. Approximately $90,000.00 was past due on those interest payments, at the time of trial. This note also provides that interest only will be due October 9, 1982, and that the note then shall be paid in nine consecutive annual installments of $100,000.00 plus interest, except that the ninth shall be in the sum of $50,000.00 plus interest, with the first installment due October 9, 1983. At the time of trial, no payment had been made upon the past due interest on this note since November 1981.

6. At the time of trial, the creditors were in default in the payments due to the Third National Bank in Nashville, with $12,000.00 in interest being past due and with the bank threatening foreclosure. Apparently, the due date of the principal of this promissory note had been set back from June 1, 1982, to October 1, 1982.

7. On or about January 27, 1982, the Tinsleys organized the debtor corporation, conveyed to it the land in question, and received the issuance of its capital stock; and it commenced this case under said Chapter 11 on the next day.

8. Little, if any, commercial activities were undertaken on the land in question from the time of its purchase by the Tinsleys until June, 1982. At the time of trial, some timber was being cut and sold for pulpwood, moss was being gathered and sold commercially, and a seam of coal was being strip-mined. It may be expected that the present commercial operations on the property will produce an average monthly income of $300.00 for the moss, $7,500.00 in coal royalties, and an undetermined sum for pulpwood which is being cut by two people and is producing about $6.00 per cord. Also, there is a prospect that hunting rights on the property may be leased for $6,000.00 per year. Mr. Tinsley estimated that, by October 1, 1982, the debtor would be able to

pay approximately $20,000.00 to the creditors.

9. The subject property has an extensive seam of coal which may be recovered by the strip-mining method, at depths which vary from a fairly profitable depth to a marginal-profit depth. The property also may be underlaid with a deep seam of coal which could be recovered only by shaft-mining. The latter type of mining apparently is not common to the area, and there appears no real prospect for this type of mining to be undertaken in the foreseeable future. A dragline is not presently employed in the mining operation. Use of a dragline would accelerate considerably the rate of recovery of the coal, with the rate dependent largely upon the size of the machine employed. The market for selling coal is very much depressed in regard to a small mining operator which is the classification of the present operator employed on the property, who seems to be the only operator available. If a dragline were employed, the additional coal mined could not be sold on the present market.

10. There is a substantial—although undetermined as to amount—equity in the value of the subject property above the indebtedness secured by the lien in favor of the creditors. Under present economic conditions, which embrace a severe recession in the coal-mining industry and a nation-wide economic recession, there is no reasonable prospect that the subject property would generate funds sufficient to do more than pay the interest on the debt owed to the creditors, if it were accruing at a monthly rate, with no prospect for any substantial compliance with the terms of the note for $850,000.00 by way of remedying the default and maintaining payments as they fall due. The debtor has no asset or financial resource of its own except the land in question. The failure of the Tinsleys prior to January 27, 1982, and the failure of the debtor since then to comply with the terms of payment of the promissory note for $850,000.00, plus interest, have prevented the creditors from making their payments to the Third National Bank in Nashville and have jeopardized the status of the trust deed of the property in favor of that bank.

## CONCLUSIONS BY THE COURT

Under the provisions of 11 U.S.C. Section 362(d), the Court is required to grant relief from the stay provided by Part (a) of that section of an act against property, under either of the alternative circumstances recited in Part (d). It is obvious that the property in question is necessary to an effective reorganization of the debtor, if such a reorganization is a reasonable prospect. The prospect here is not encouraging, but at this point it is not sufficiently clear to the Court that an effective reorganization cannot be accomplished. The Court has found that the debtor does have a substantial equity in the subject property. The existence of either of these facts eliminates the Court's consideration of granting relief from the stay under the terms of the second set of circumstances outlined in Part (d) of Section 362.

The first set of circumstances outlined in Part (d) of Section 362 deals with cause, including the lack of adequate protection of the interest of the creditors in the property in question. At the present time, such interest is adequately protected by the debtor's substantial equity in the land; however, there may be other cause for granting relief from the stay.

The Court finds that the failure of the Tinsleys to make the payments on the note for $850,000.00, plus interest, through January 27, 1982, and the failure of the debtor subsequently to pay anything on this note is causing the creditors great difficulty in making their payments on their note to the Third National Bank in Nashville. If that bank undertakes foreclosure proceedings under its deed of trust, covering the subject property, that will endanger the creditors' interest in this land, regardless of the debtor's present equity.[1] The undertaking by the bank of foreclosure proceedings would

---

1. Whether or not the bank may undertake foreclosure proceedings or whether it should be permitted to do so is a matter not now before the Court. See 11 U.S.C. § 362(a)(4).

in itself be sufficient cause for granting relief from the stay, in the absence of collusion on the part of the creditors and in the absence of any remedial action on the part of the debtor.

Considering the entire case, the bankruptcy judge concludes that the debtor should have more time in which to undertake a solution to its financial difficulties, perhaps by way of sale of part or all of the subject property to an outside party. At the same time, it appears that the creditors are entitled to relief from the stay but not necessarily on the terms sought by the complaint of J. Edgar Hammonds.[2] If the debtor's financial life is to survive even during this clarification period, it appears that it will have to obtain the infusion of new funds from the Tinsleys or elsewhere. The bankruptcy judge further concludes that it is equitable and in accordance with the terms of the statute in question to require that the debtor immediately pay the sum of $12,000.00 to the creditors, which can then be paid on to the Third National Bank in Nashville and that a like sum should be paid monthly in order to provide some resource by which the creditors may undertake to obtain a renewal of credit by said bank on October 1, 1982, or extension of credit from some other source by that date. Accordingly, the Court will enter an interlocutory judgment to the effect that relief is granted from the stay by way of conditioning the continuance of the stay upon the prompt payment of said sums to the creditors during the continuance of the stay, with leave to J. Edgar Hammonds to seek other relief from the Court as may be justified by the circumstances hereafter occurring.

---

**2.** In opposition to granting relief from the stay provided for by 11 U.S.C. § 362(a), the debtor urges upon the Court the holding in *In re Alyucan Interstate Corporation*, 12 B.R. 803, 7 B.C.D. 1123, 4 C.B.C.2d 1066 (Bkrtcy.D.Ut. 1981). The Court notes, however, that the views expressed in that case are mainly dicta, due to that Court's finding of an "equity cushion", and it is to be borne in mind that the Court in the instant case finds that a substantial equity exists in the subject property.