### In re Harvey D. SHEEHAN and Andrea L. Sheehan, d/b/a J.E.S. Farms, a sole proprietorship, Debtors.

### Bankruptcy No. 384–00013.

United States Bankruptcy Court, D. South Dakota.

Feb. 19, 1986.

See also 38 B.R. 859.

---

James P. Hurley, Bangs, McCullen, Butler, Foye & Simmons, Rapid City, S.D., for debtors.

Robert E. Hayes, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for Prudential Ins. Co. of America.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

The debtors filed their petition in bankruptcy under Chapter 11 on February 23, 1984. The debtors are farmers and ranchers doing business on a 16,703-acre agricultural operation near Pierre, South Dakota. Approximately 12,250 acres of the debtors' land are under irrigation provided by 12½ miles of canals, over 50 miles of underground pipe, and 92 pivot systems which draw water from the massive Oahe Reservoir which borders the western edge of the farm. Corn, popcorn, soybeans, wheat, oats, and hay are among the crops produced, with an emphasis on irrigated corn. In addition to farming, the debtors have engaged in a substantial livestock business, owning up to 5,000 head at times. A substantial grain drying and handling center facilitates processing and storing the annual crop.

The Prudential Insurance Company of America (Prudential) financed the construction of the multi-million-dollar irrigation project which was begun in 1979. The Chemical Bank of New York provided the debtors' operating line of credit in 1981. In 1982 and 1983, Wells Fargo Ag Credit Corp. (Wells) advanced the operating line of credit for the debtors, and has continued to do so post-petition.

On February 25, 1985, Prudential filed several motions. First, they filed a motion for determination of secured status, asking the Court to determine under 11 U.S.C. § 506(a) that Prudential has a lien, subject only to the prior lien of Wells Fargo Ag Credit Corp., in the funds set aside out of cash collateral to pay administrative expenses in the Court's order of April 9, 1984, and further asking the Court to direct that no use of these funds be made absent provision of adequate protection for the use of cash collateral under 11 U.S.C. § 363.

The debtors responded by proposing to pay the full amount in the administrative expense fund ($100,000) to Prudential upon confirmation of the debtors' plan of reorganization. The debtors then moved the Court to determine, pursuant to 11 U.S.C. § 506(a), the value of the collateral subject to the mortgage of Prudential, to determine the portion of Prudential's claim that will be allowed under 11 U.S.C. § 502, and to bifurcate, pursuant to 11 U.S.C. § 506(a), Prudential's claim into secured and unsecured portions. The debtors further moved the Court to determine that Prudential's claim and mortgage are valid only to the extent of the value of the collateral and to determine that, pursuant to 11 U.S.C. § 502(b)(2), the accrual of the interest on Prudential's claim is suspended as of the date of the petition because the liquidation value of the collateral is insufficient to pay both the principal and interest accrued claimed by Prudential as of the filing date.

Also on February 25, 1985, Prudential filed a motion to dismiss the Chapter 11 case under 11 U.S.C. § 1112(b) and a motion for relief from stay under 11 U.S.C. § 362. Prudential's arguments on both motions center on the premise that the debtors will be unable to reorganize under any circumstances. The debtors responded by filing their disclosure statement and plan with the Court on April 2, 1985, and by arguing that Prudential had not established grounds for dismissal under 11 U.S.C. § 1112(b) and that relief from the stay was not warranted because Prudential's interests were adequately protected.

A preliminary hearing on the motion for relief from stay was held on April 2, 1985, and an order was subsequently entered by the Court setting all pending matters for hearing on May 6, 1985, in Pierre, South Dakota. At the hearing on May 6, 1985, exhibits and testimony were presented, and the motion to dismiss, the motion for relief from stay, and the expanded motion for valuation and determination of secured status were taken under advisement. The hearing on the debtors' disclosure statement was continued pending the Court's decision on the three motions.

## MOTION TO DISMISS

■ Prudential filed its motion to dismiss pursuant to 11 U.S.C. § 1112(b). Section 1112(b) provides that a court may dismiss a case for cause, including the following reasons advanced by Prudential:

(1) Continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation;

(2) Inability to effectuate a plan; and

(3) Unreasonable delay by the debtors that is prejudicial to creditors.

In considering any motion under this section, the Court must begin by recognizing that the stated purpose of Chapter 11 is to further the rehabilitation of businesses in economic distress. "A Court should not precipitously sound the death knell for a debtor by prematurely determining that the debtor's prospects for economic revival are poor." *In re Shockley Forest Industries, Inc.*, 5 B.R. 160, 162 (Bkrtcy.N.D.Ga. 1980). The burden of proof in a motion for dismissal rests squarely upon the moving party. *In re Economy Cab & Tool Co., Inc.*, 44 B.R. 721, 724 (Bkrtcy.D.Minn.1984).

■ What might constitute cause for dismissing a Chapter 11 case is a matter of judicial discretion to be determined upon consideration of the circumstances of each case. The legislative history of Section 1112(b) indicates that the court is to be given wide discretion to make an appropriate disposition of the case, including consideration of facts not specifically listed. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405

(1977); S.Rep. No. 989, 95th Cong., 2d Sess. 117 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787. The legislative history also indicates that the court may use its equitable powers to reach an appropriate result in individual cases. *Id.*

■ Under Section 1112(b)(1), a moving party must demonstrate that there is both a continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. *See, e.g., In re Karl A. Neise, Inc.*, 16 B.R. 602 (Bkrtcy.S. D.Fla.1981); *In re Steak Loft of Oakdale, Inc.*, 10 B.R. 182 (Bkrtcy.E.D.N.Y.1981). At early stages in the proceedings, in order to prove "absence of a reasonable likelihood of rehabilitation," a moving party must show that there is no more than a "hopeless and unrealistic prospect" of rehabilitation. *Id.* Courts have found a sufficient likelihood of rehabilitation where the debtor's own projections show a "near certainty of short-term operating losses," *In re Garland Corp.*, 6 B.R. 456 (Bkrtcy. 1st Cir.1980); and, in an extreme case, even where apparent chances of survival are "precarious," so long as the remaining corporate principals have "business acumen and sufficient resilience" to build the business back up, *In re Burnside, Lee & Harris Diamond Co.*, 17 B.R. 104 (Bkrtcy.N.D. Fla.1981).

■ In the instant case, the Court finds there has not been a continuing loss to or diminution of the estate post-petition. On the contrary, the debtors-in-possession and their management team have made extensive repairs to the irrigation system and significant improvements in the management practices of J.E.S. Farms. Over a period of four years just prior to the filing of the Chapter 11 petition, Agri-Management, the management team imposed upon J.E.S. Farms by Prudential as a condition of the original mortgage, showed losses totaling $7,425,433.00. By contrast, the debtors-in-possession and their management team showed a net operating profit of $1,400,000.00 in 1984, realizing more income than projected and less expense than

projected. During that same time, the debtors-in-possession had unusual expenses for equipment and for irrigation system repair—expenses which may not be necessary in succeeding years. Similar profit projections have been made for the 1985 operating year. Such a turnaround in an operation of this magnitude is surprising, to say the least, and certainly dispels any doubts as to the quality of performance by the debtors-in-possession. This Court would be remiss to conclude under these circumstances that there is no reasonable likelihood of rehabilitation prior to the hearings on the disclosure statement and plan.

Under Section 1112(b)(2), the moving party must show that a debtor lacks all ability to formulate or carry out a plan. The courts have usually limited application of this ground to cases where a debtor was little other than a corporate shell lacking a place of business, employees, payroll, or discernible economic activity, *see, e.g., In re Tracey Service Co., Inc.,* 17 B.R. 405, 409 (Bkrtcy.E.D.Pa.1982); or where a debtor has repeatedly proposed unconfirmable plans, *see, e.g., In re Fossum,* 764 F.2d 520 (8th Cir.1985).

In the instant case, Prudential has failed to show that the debtors lack the ability to effectuate a plan. First, the debtors have filed a plan and disclosure statement, which has yet to be considered by the Court. Second, the debtors-in-possession are operating J.E.S. Farms; it is an active, ongoing concern, generating some amount of profit. Any speculation about the feasibility of the specific provisions of the proposed plan is premature.

Under Section 1112(b)(3), the moving party must show unreasonable delay by the debtors that has resulted in actual prejudice to creditors. Where a debtor has been an "apparently viable" business, it must be given a reasonable amount of time to work out an arrangement with its creditors. *In re Bonded Mailings, Inc.,* 20 B.R. 781 (Bkrtcy.E.D.N.Y.1982).

In the instant case, the debtors filed a disclosure statement and plan approximately 13 months after the case was commenced. This does not seem to be an inordinate amount of time to formulate a plan considering the fundamental changes in management and the size and complexity of the estate, its assets, and liabilities. There is no evidence of an intent to delay on the part of the debtors, and, as previously discussed, the debtors' management of the estate has been excellent and has not resulted in prejudice to the creditors. The intent of the Code is to give a debtor breathing space in which to concentrate his efforts on reorganization. The Court finds that these debtors have not abused the process, but have worked diligently under the circumstances to formulate a plan, which is now in a position to be considered by the creditors and brought before the Court. Finally, the Court feels it must comment on the apparent irony here. Prudential accuses the debtors of unreasonable delay in taking a little over a year to file a plan in this case, yet this same creditor left its own hand-picked management team in place for four years, despite losses of over a million dollars each year. The motion to dismiss pursuant to Section 1112(b) must be denied.

## VALUATION AND DETERMINATION OF SECURED STATUS

The motion for determination of secured status, as originally filed by Prudential, related only to the administrative expense fund previously established by the Court. The debtors then moved to expand the scope of the hearing to include valuation of the property subject to Prudential's mortgage and a determination of the secured status of Prudential's entire claim.

First, the Court finds that Prudential's lien interest in the administrative expense fund remains the same as it was upon entry of the order of April 9, 1984; Prudential is secured in those funds, the proceeds of the sale of 1983 crops, subject only to any prior lien of Wells Fargo. The administrative expense fund was originally segre-

gated as a part of a cash collateral order in 1984. The Court at that time ordered that any payments for professional services out of this fund must comply with the applicable provisions of the Bankruptcy Code and Rules. *See generally* 11 U.S.C. §§ 327, 328, 329, 330, and 331. To date, none of the funds have been used. All of the funds are in an interest-bearing account. This offers sufficient protection for the lien interest of Prudential. It should be noted, also, that the debtors have proposed to pay these funds to Prudential upon confirmation of the plan. This indicates to the Court that the debtors are continuing to abide by the Court's previous order and have no intention to try to use the funds for improper purposes. The Court must note, however, that no time limit was placed upon use of these funds, and should the debtors require a portion of them prior to confirmation, they would be free to apply to the Court in the prescribed manner, and Prudential would have notice and an opportunity to object to such use.

Second, the debtors have requested a determination by this Court of the value of the debtors' real estate and irrigation system equipment fixtures located on the land, which are the subject of Prudential's mortgage.

J.E.S. Farms, the subject property, consists of a total of 16,709.12 acres, of which 12,227.7 acres are irrigated; 2,972.5 acres are dryland farmed; 1,300 acres are in native pasture; and approximately 208.92 acres are occupied by roads and buildings.

The irrigation system consists of 91 stationary and towable center-pivot sprinkler systems. Irrigation water is pumped from Lake Oahe at the extreme northwest corner of the farm and is delivered to each of the center-pivot sprinkler systems via a canal system that extends approximately 13 miles along the north and east sides of the farm. A system of underground steel and PVC pipelines distributes the water from the canal system to the individual center-pivot sprinklers. An examination of the soil survey indicates that the soils are more than 85 per cent of the Class II types,

which are appropriate for irrigation purposes in most locations.

The farm is located in southwest Sully County and northwest Hughes County. It is approximately 12 miles north of Pierre, South Dakota, the county seat of Hughes County and the State Capital. Access to the property is good via various state and county roads. The farm includes four building sites, three of which include housing facilities, and the other is used solely for grain and machinery storage.

After careful consideration of the relevant evidence, including testimony, exhibits, and pictures, the Court adopts the appraisal of Mr. Clarence Mortenson, as supplemented, and concludes that the fair market value of the debtors' real estate and irrigation system equipment fixtures located thereon, which are subject to Prudential's mortgage, is $6,603,450.00.

Both appraisers, Mr. Mortenson and Mr. Peterson, have extensive experience in appraising farmland and both used the three standard approaches to calculating the value of real estate: the market data approach, the cost approach, and the income approach.

The market data approach consists of a comparison of the subject property with other properties which have been sold, with various adjustments made for differences in property characteristics. The cost approach estimates the property value as indicated by the sum of the value contributed by the land, as though unimproved and subject to improvement, and the value contributed by the improvements. The income approach considers the stream of income which the property is likely to produce during its economic life.

Both appraisers also acknowledged placing the most emphasis on the market data approach, using the other two methods as a "check" for accuracy. The vast differences in the two appraisals can be partly explained by examining the comparable sales and the adjustments made by each appraiser for such variables as time of sale, quality of soil, size and location of the property, improvements, and methods of

financing on the market data approach. Several adjustments made by Mr. Mortenson and not made by Mr. Peterson led the Court to conclude that the Mortenson appraisal more accurately reflected the value of the subject property.

Mr. Mortenson adequately supported his appraisal with comparable sales. He made major adjustments for differences from the subject property in types of soils, for size, and for location of the various sale properties. Mr. Peterson did not adjust for these factors. Mr. Mortenson also adjusted the value of the improvements, including the irrigation system equipment, for the history of problems and likelihood of future repairs. Mr. Peterson testified that he thought problems with irrigation systems were normal and made only slight adjustments for these factors.

Mr. Mortenson has personal farming and ranching experience in the Pierre area, which enhanced the credibility of his observations. Mr. Peterson's credibility was tarnished by several factors. He relied almost exclusively on information provided by Agri-Management and Morris Irrigation in appraising the irrigation system and computing its yields. In addition, he reluctantly admitted upon close cross-examination that he had been told that Prudential was dissatisfied with the other appraiser it had hired and that he had been told the amount of the mortgage. The Court notes that it seems more than coincidental that Mr. Peterson's value figure came so close to the amount of the mortgage and finds it patently offensive that an appraiser would be given such information while making his appraisal.

## RELIEF FROM STAY

Prudential filed its motion for relief from stay pursuant to 11 U.S.C. § 362. Section 362 provides in pertinent part:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property under subsection (a) of this section of such party in interest; or

(2) with respect to a stay of an act against property, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

The party requesting relief under this subsection has the burden of proof on the issue of the debtor's equity in the property, and the debtor has the burden of proof on all other issues. 11 U.S.C. § 362(g).

In the instant case, there is no dispute as to the debtors' lack of equity in the subject property. The debtors point out that all of the real estate and the irrigation system are covered by Prudential's mortgage; without this property, there is nothing left to reorganize. Prudential's response is that the debtors will be unable to reorganize under any circumstances and, therefore, since there can be no effective reorganization, the property is not necessary. The Court is not persuaded by this argument and finds that the property is necessary for an effective reorganization.

The question of whether Prudential's secured claim is adequately protected is more difficult. Although the concept of adequate protection is not precisely defined in the Bankruptcy Code, neither the Code nor the legislative history indicates that Congress intended the concept of adequate protection to go beyond the scope of protecting the secured claim holder from a decrease in the value of its interest as a result of the stay. *See, e.g.,* S.Rep. No. 989, 95th Cong., 2d Sess. 4 (1978), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5790. What creditor rights constitute the interest to be protected and how they are to be protected has been the subject of much controversy.

Most courts have concluded that if a creditor is undersecured, at the very least, the value of its lien interest to be protected

is the value of its collateral at the time the petition is filed. *See, e.g., In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bkrtcy.D. Utah 1981); *In re Pine Lake Village Apartment Co.*, 19 B.R. 819 (Bkrtcy.S.D.N. Y.1982); *In re Kingman Warehouse Co. IX*, 17 B.R. 377 (Bkrtcy.N.D.Iowa 1982). If the creditor is oversecured at the time the petition is filed, it is entitled to the amount of the debt plus interest and expenses. *Id.*

The Ninth Circuit Court of Appeals, in *In re American Mariner Industries, Inc.*, 734 F.2d 426 (9th Cir.1984), concluded that, as a part of their rights, undersecured creditors were entitled to interest payments under 11 U.S.C. § 362(d)(1) to compensate for the delay in enforcing their foreclosure rights.

The Eighth Circuit Court of Appeals, in *In re Briggs Transportation Company*, 780 F.2d 1339 (8th Cir.1985), considered the same question recently and took a different approach. The Court observed that the statutory scheme of the Bankruptcy Code indicates that adequate protection is intended to encompass a broad range of creditor interests and does not mandate an interpretation of the creditors' interest as the whole of the economic bargain.

> [C]reditors have no right to be placed in the same economic position as if there had been no bankruptcy filing. Congress has observed "[t]here may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws." S.Rep. No. 989 at 53, 1978 U.S.Code Cong. & Ad.News at 5839. Bankruptcy involves a balancing of interests between the debtor and creditors. The effect of the bankruptcy laws is to alter or eliminate a debtor's obligations to its creditors upon the advent of the debtor's inability to meet those obligations. These changes are imposed as a matter of law and leave creditors in a very different economic position than before the debtor filed for bankruptcy. A creditor's interest in the collateral is tied to possible default by the debtor and, like any contractual agreement, is always

subject to existing federal law, including the automatic stay provisions under section 362(a). The essence of a creditor's interest in the collateral is not necessarily foreclosure and reinvestment, but may be the guarantee that, as a secured creditor, it will be paid in full up to the lien value of the collateral. Unsecured creditors often get back little or nothing of what is owed to them despite their original bargain with the debtor for full repayment.

*Id.* at 1346–1347.

The Eighth Circuit concluded that Congress intended the concept of adequate protection to be a flexible one and that a secured creditor is not in every instance entitled to be compensated for delay in enforcing its foreclosure rights. They suggested two factors a court might consider in determining whether a creditor should be compensated for such delay: (1) whether the taxes are being paid; and (2) whether the collateral is being kept free of statutory liens.

In the instant case, the Court concludes that the automatic stay should be continued and that the interests of Prudential are adequately protected. Prudential was undersecured at the time the petition was filed. The collateral subject to Prudential's mortgage has been well-preserved and maintained since the date of filing. From the exhibits and testimony at the hearing on May 6, 1985, it appears that the debtors have spent approximately $218,000 post-filing on the repair, maintenance, and improvement of the irrigation system. They have made significant changes in the management of the ranch, including increased soil testing; improved tillage, weed control, and drainage; and they have planted trees for shelter belts.

Using the Eighth Circuit analysis in the *Briggs* case as a guide, the Court also concludes that this is not a situation where the creditor is entitled to be compensated for delay in exercising its foreclosure rights. All the real estate taxes have been paid; the property is insured; and all trade creditors are current.

**304**

The situation involving declining land values in this and other cases is an economic risk to be borne not only by a debtor in bankruptcy, or mortgagor, but is shared by a creditor or mortgagee in real estate transactions. Real estate is a part of the business of both the debtor and the creditor and declining land values are a shared risk. The Court is aware that with the phenomena of declining real estate values, creditors and debtors are engaged in general workouts outside of bankruptcy wherein the creditor absorbs substantial losses due to the declining value of the land. That same concept is carried forward in the bankruptcy posture where the Code requires the debtor to reorganize around the market value of the real estate determined by the court in the absence of agreement by the parties. The intent of Congress is that the debtor should be able to reorganize around the market value of real estate rather than having foreclosure by the creditor at the same market value, with the creditor taking a loss in either event—the creditor will either bear the expense of participation in the bankruptcy reorganization or the expense of foreclosure in another forum. Any loss under these circumstances cannot be attributed to the imposition of the stay.

In view of the foregoing, counsel for the debtors is directed to prepare findings of fact and conclusions of law, not inconsistent with this Memorandum Decision, pursuant to Bankr.R.P. 7052 and 9014 and F.R. Civ.P. 52, and draft an appropriate order and judgment in accordance with Bankr. R.P. 9021. The Clerk of this Court is also directed to schedule a hearing on the debtors' disclosure statement, which had been continued pending the Court's decision on the matters herein.