**In re David William CARSON, Marjorie Ellen Carson, Debtors.**

**FEDERAL LAND BANK, Plaintiff,**

v.

**David William CARSON, Marjorie Ellen Carson, Defendants.**

**Bankruptcy No. 82–20871.**
**Adv. No. 83–0172.**

United States District Court,
D. Kansas.

Oct. 27, 1983.

David William & Marjorie Ellen Carson, David W. Boal, Kansas City, Kan., for debtors/defendants.

Carol Park, Asst. U.S. Trustee, Wichita, Kan.

Federal Land Bank, Lawrence, Kan., Thomas M. Mullinix, Kansas City, Kan., for plaintiff.

F. Stannard Lentz, Mission, Kan., for Creditors' Committee.

### CERTIFICATE OF REVIEW

SAFFELS, District Judge.

The attached order has been certified by Bankruptcy Judge Benjamin E. Franklin under Rule 42(e)(2)(a) of the Local Rules of Court of this District. Upon review of the same in accordance with Rule 42(e)(2)(b) of said Local Rules, the undersigned hereby approves and adopts said order in its entirety including the findings of fact and conclusions of law therein contained.

### MEMORANDUM OPINION

BENJAMIN E. FRANKLIN, Bankruptcy Judge.

This matter came on for final hearing on August 2, 1983, on a complaint for relief from stay. Plaintiff, Federal Land Bank (FLB), appeared by counsel, Thomas M.

Mullinix of Evans, Mullinix & Jarczyk. The debtors/defendants, David and Marjorie Carson, appeared in person and by counsel, David W. Boal of Carson, Fields, Boal, Jeserich & Asner. Also appearing were the Creditors' Committee by counsel, Carl Clark; and the Northeast Kansas Production Credit Association by counsel, Richard O. Skoog of Skoog & Latimer.

## FINDINGS OF FACT

Based on the evidence, pleadings, file, examiner's report and statements of counsel, the Court finds as follows:

1. That this Court has jurisdiction of the parties and subject matter pursuant to Rule 42 of the United States District Court, District of Kansas; and that venue is proper.

2. That the debtors executed a note to FLB on August 3, 1977, in the principal sum of $817,000.00 with annual interest of 8.25%, due in 33 annual installments of $72,780.00 commencing October 1, 1978, and with a default rate of interest at 10.25% per annum.[1] This note is secured by a duly recorded mortgage of 1231.77 acres of the debtors' real estate.

3. That debtor, David Carson, is the assignee of a note to FLB executed on December 27, 1979, in the principal sum of $202,000.00 with annual interest of 9.5% due in 33 annual installments of $20,200.89 commencing October 1, 1980, and with a default rate of interest at 11.5% per annum. This note is secured by a duly recorded mortgage of 216 acres of real estate owned by defendant/debtor, David William Carson.

4. That it is undisputed that both notes are in default and have been since October 1, 1981. The total balance due on both notes, including postpetition interest[2] was

$1,108,946.30 on July 7, 1983, the date of FLB's complaint and $1,119,069.69 on August 2, 1983, the date of this hearing.[3] The per diem interest rate on both notes is about $384.00, as of October 1, 1983. Thus, interest is accruing at almost $11,000.00 a month.

5. That it is undisputed that the debtors have equity in the subject property; but the value of the property and thus, the amount of their equity is disputed. FLB had two witnesses testify on value: Darrel Filbert, an assistant vice president of FLB, and in charge of appraisals for six years; and Howard Crow, a branch manager of FLB. They valued the total 1447 acres at $1,328,600.00. This valuation was itemized as follows: Johnson tract at $1,500.00 per acre; Ott tract at $450.00 per acre; Barker and Ruttan tracts at $1,200.00 per acre; Adler-Beaver, Logan-McAfee, Gast, Howard and Lamb-Doane tracts at $1,000.00 per acre. The debtors had one witness testify on value, debtor, David William Carson. Mr. Carson disputed FLB's valuation of the Gast, Ruttan, Barker and Johnson tracts. He testified that Gast was worth a minimum of $1,500.00 per acre because there was a spring on the tract. He valued Ruttan at $1,600.00 per acre because it was bordered on two sides by roads. He valued Barker at a minimum of $2,000.00 per acre because he recently sold 30 acres of it (Barker is 230 acres) for $60,000.00. He testified[4] that Johnson was worth more than FLB's valuation of $1,500.00 per acre because the zoning had changed since FLB's valuation and because the debtors were going to subdivide and develop the Johnson tract for single family homes, as part of their plan of reorganization, which would greatly enhance its value. Mr. Carson also testified[5] that most of the subject property

1. The debtors dispute whether FLB's allowed secured claim should include the additional 2% of default interest.

2. It is undisputed that FLB's allowed secured claim includes post petition interest pursuant to 11 U.S.C. § 506(b), since it is oversecured.

3. The debtors will shortly remit the net sale proceeds of a $60,000.00 sale of 30 acres. This will reduce the balance due FLB.

4. This testimony was given on May 24, 1983, in a hearing on the debtors' application to develop the Johnson tract.

5. This testimony was given on May 24, 1983, in a hearing on the debtors' application to develop the Johnson tract.

had been listed for sale for over two years; and he had received two offers on portions of the total acreage.

The Court finds, from all of the evidence, that FLB's $1,328,600.00 valuation is reasonable. FLB's witnesses were experienced appraisers and they based their valuation on the present condition of the land, rather than anticipated and uncertain developments. The Court also must give credence to the debtors' $1,026,266.00 valuation of the subject property in their disclosure statement, and to the examiner's valuation of the same in his report, at $666,650.00. In light of these lower valuations, FLB's valuation seems reasonable and fair.

6. That the debtors' equity as of October 1, 1983, was $138,600.00 or 11% of the debt.

7. That there was no evidence that the property is appreciating or depreciating in value.

8. That the debtors filed a Chapter 11 petition in this Court on September 10, 1982. They received two extensions of the exclusive filing period and filed their first disclosure statement and plan of reorganization on May 9, 1983, within the exclusive time period. Their second amended disclosure statement was approved on September 28, 1983. Their plan of reorganization and an alternative plan of liquidation by the Creditors' Committee comes on for confirmation on October 31, 1983.

9. That the debtors' plan of reorganization calls for rehabilitation of their cattle ranch and a new venture in land development. The debtors admittedly have no expertise in land developing. David William Carson has been an attorney for 44 years and a cattle rancher for several years. The debtors propose development of the Johnson tract, 103 acres, in three phases. They will subdivide the tract into about eighty-five 2500 square foot residential lots, and into several commercial lots on the perimeter of the development. Their plan will be funded from the land development profits, and from the profits of their cattle ranch

and sale of unwanted tracts of land, to a lesser degree.

10. That the demand for the debtors' proposed land development was greatly disputed. FLB's witness, Bruce Parker, an experienced and certified appraiser, testified and submitted a report that the highest and best use of the Johnson tract was as farmland. He reviewed the low number of building permits, the poor track record of other subdivisions in the area and census data on population growth, and concluded that there would be little demand for the proposed development. The debtors had several witnesses. David William Carson [6] testified that there would be great demand for the proposed development of middle income, $60,000.00 houses, on large 2500 square foot lots, because there was no comparable subdivision in the area and because the Johnson tract was in an attractive location. Clarita DePaulis, a realtor with five years experience, testified that the proposed development would be competitive with Sherwood Forest, a nearby subdivision. Sherwood has been in development for two years, has 73 lots, 25 of which are occupied to date. She also testified that a large influx of military personnel at nearby Fort Leavenworth would increase demand; but that transient, noncommissioned officers would not buy $60,000.00 houses and that the increase in Leavenworth personnel had not increased demand for the Sherwood lots. Gerald Criswell, whom the debtors have tentatively engaged to build the houses, also testified that there would be demand for the development. He had previously developed seven subdivisions in the county, but had not developed anything since the early 1960s. He testified that he did not consider saleability, demographics or the desirability of the development; rather, he had a "gut feeling" the development would be successful.

11. That to date, the debtors have not obtained acceptable financing for the development. They estimate that phase one will

---

**6.** This testimony was given on May 24, 1983, in a hearing on the debtors' application to develop the Johnson tract.

cost them $120,000.00. Their prospective lender demands priority over FLB's first mortgage. The debtors filed an application to develop with a subordination of FLB's lien to a lien of the prospective lender. This Court denied the application because under 11 U.S.C. § 510, subordination of a creditor's lien is improper absent inequitable conduct of the creditor. The debtors filed a second application to develop with unsecured credit prior to FLB, pursuant to 11 U.S.C. § 364(d)(1). This Court denied that application, as well, because the debtors failed to prove that FLB's interest would be adequately protected as required by § 364(d)(1).

12. That the debtors admittedly cannot pay the 1983 annual installments nor can they pay the accruing interest. They have no unencumbered property to give FLB replacement liens on.

## ISSUE INVOLVED

Whether the Debtors' equity cushion of $138,600.00 (11% of the value of the security) adequately protects the secured creditor's interest within the meaning of 11 U.S.C. § 362(d)(1) such that relief from stay should be denied.

## CONCLUSIONS OF LAW

11 U.S.C. § 362(d)(1) states as follows: "§ 362. Automatic stay.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;"

Section 362(d)(1) is the reconciliation of competing interests. On the one hand, there is a beleaguered debtor desperately in need of the automatic stay and the attendant time to reorganize free from harassing creditors. On the other hand, there is a secured creditor with a bargained for property interest entitled to fifth amendment protection. See H.R. 95–595, 95th Cong., 1st Sess. (1977) 339, U.S.Code Cong. & Admin.News 1978, p. 5787, citing *Wright v. Union Central Life Ins. Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935).

Adequate protection is the point of mediation. The debtor avoids the harshity of a relief from stay by adequately protecting the creditor's interest; and the creditor's burden is eased by whatever method of protection the debtor provides. Given the complexities and variations in debtor/creditor relations, adequate protection is a flexible concept. Collier equates it with a balancing of the debtor's and creditor's respective harm. 2 Collier on Bankruptcy 2d, § 362.07[1] (15th ed.). 49.

Judge Mabey explains adequate protection best, in *In re Alyucan Interstate Corp.,* 12 B.R. 803, 805, 7 B.C.D. 1123, 4 C.B.C.2d 1066 (Bkrtcy.D.Utah 1981):

"*Adequate protection is not defined in the Code. This omission was probably deliberate. Congress was aware of the turbulent rivalry of interests in reorganization. It needed a concept which would mediate polarities. But a carefully calibrated concept, subject to a brittle construction, could not accommodate the 'infinite number of variations possible in dealings between debtors and creditors.' H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787, 6295. This problem required, not a formula, but a calculus, open-textured, pliant, and versatile, adaptable to 'new ideas' which are 'continually being implemented in this field' and to 'varying circumstances and changing modes of financing.' Id. Adequate protection was requisitioned to meet these needs. Its meaning, therefore, is born afresh out of the 'reflective equilibrium' of each decision, understood through analysis of the reorganization context and the language of Section 362(d).*"

Given the purpose and policy of § 362(d)(1), a balancing of interests, most

courts consider a number of factors in determining whether a secured creditor's interest is adequately protected, such as equity, necessity of property to an effective reorganization, ability to pay interest or give replacement liens or indubitable equivalents, debtor's care in keeping property insured and repaired. See, e.g., *In re Tucker,* 5 B.R. 180, 6 B.C.D. 699, 2 C.B.C.2d 535, CCH ¶ 67955 (Bkrtcy.S.D.N.Y.1980); *In re Monroe Park,* 17 B.R. 934, 6 C.B.C.2d 139 (U.S.D.C.Del.1982); *In re Alyucan Interstate Corp., supra.*

■ The primary, and often determinative factor, is the existence of an adequate equity cushion. Most courts find that a creditor's interest is adequately protected if the value of its security exceeds the amount of its claim by a "sufficient" amount.[7] What is a "sufficient" cushion has been the subject of much litigation and evades a definitive formula as much as "adequate protection" does. See, e.g., *In re Hawaiian Pac. Industries,* 17 B.R. 670 (Bkrtcy.D.Hawaii 1982) where the court found without explication that a 15% equity cushion in real estate was sufficient; *In re San Clemente Estates,* 5 B.R. 605, 6 B.C.D. 838, 2 C.B.C.2d 1003 (Bkrtcy.S.D.Cal.1980) where the court found a 65% cushion sufficient; *In re Schlichter,* 22 B.R. 666 (Bkrtcy.E.D.Pa.1982) where $150,000.00 equity in $1,250,000.00 of real estate was found sufficient; *Ukranian Sav. and Loan Ass'n v. Trident Corp.,* 22 B.R. 491 (U.S.D.C.E.D.Pa.1982) where $30,000.00 equity in $280,000.00 of real estate was found insufficient; *In re LeMay,* 18 B.R. 659 (Bkrtcy.D.Mass.1982) where a 7% cushion was found inadequate.

The emerging view, however, is that an otherwise sufficient cushion may not adequately protect the creditor if the cushion is being eroded by accruing interest and/or depreciation. In *In re 5-Leaf Clover Corp.,* 6 B.R. 463 (Bkrtcy.S.D.W.Va.1980) the court required the debtor to maintain the equity cushion and forestall the erosion with a $35,000.00 interest payment. See also *In re Rogers Dev. Corp.,* 2 B.R. 679, 5 B.C.D. 1392, 1 C.B.C.2d 499, CCH ¶ 67627 (Bkrtcy. E.D.Va.1980). In *In re Monroe Park, supra,* the court granted relief from stay based on an eroding equity cushion. In *In re Pitts,* 2 B.R. 476, 5 B.C.D. 1129, 1 C.B.C.2d 241 (Bkrtcy.C.D.Cal.1979), the court found an eroding $19,000.00 cushion on security worth $125,000.00 inadequate, but it continued the hearing to determine if the debtor could maintain and avoid further dissipation of the cushion.

■ The Court finds in the case at bar that FLB's security, worth $1,328,600.00, is protected by an equity cushion of $138,600.00 or 11%. If the worse should happen, and FLB foreclosed on the property in the coming months, FLB would be completely protected. It could recover its secured claim, including postpetition interest, allowable attorney fees and reasonable costs. Although the cushion is eroding by almost $11,000.00 per month in accuring interest, it would be a year before the cushion would expire and before FLB would be in danger of becoming undersecured. Furthermore, it could be longer than a year. The debtors will soon tender to FLB the net proceeds of a $60,000.00 sale of a 30-acre tract; and they are diligently trying to sell other tracts unnecessary to their plan of reorganization, in further reduction of their debt to FLB.

The Court hesitates to pull the rug from under the debtors at this stage of the proceeding, particularly since FLB will be oversecured for at least another year. These Chapter 11 debtors ought to have the opportunity to reorganize so that they can make other creditors whole, as well. This land is vital to their reorganization. In balancing the respective harm, the Court finds no substantial harm at this time to

---

**7.** Judge Mabey rejects a cushion analysis in *In re Alyucan Interstate Corp., supra,* finding that adequate protection is a concept designed to protect the value of the lien from depreciation, not the oversecured status of the creditor. This Court finds, however, that a fundamental, bargained for protection of secured creditors' liens is an equity cushion, and that this is the simplest, most concrete way of protecting a lien. Thus, this Court is in accord with the majority view that equity is an important element of adequate protection.

the oversecured FLB in allowing the debtors more time to attempt rehabilitation.

This Court agrees with the emerging view of bankruptcy courts, that an erosion of the equity cushion may negate the inherent protection of such cushion. But in the case at bar, the cushion has not yet eroded sufficiently enough to negate the protection a cushion otherwise would afford. Thus, the Court will deny relief from stay at this time.

The coming months will be of particular importance to the parties herein. The debtors' plan of reorganization and the creditors' committee plan of liquidation will soon come on for confirmation. The debtors will continue to seek financing for their land development venture. They will also presumably continue to seek purchasers for unwanted tracts, so that they can reduce their debt to FLB. These events and contingencies will determine whether this land, so vital to their reorganization, will actually be a part of an effective, feasible reorganization; and determine whether the debtors' equity will continue to erode at the same or an accelerated rate.

In the event an effective reorganization becomes implausible, or in the event that the equity continues to erode, the Court will entertain another motion for relief from stay. FLB should not have to wait until it is undersecured, nor should it have to wait until dissipation of the cushion is imminent. More importantly, despite an equity cushion, the debtors should not be able to shield real estate that is not necessary to an effective reorganization.

At this juncture, however, there is still the possibility of an effective reorganization and it is also possible that the debtors will reduce FLB's debt or halt the erosion of the cushion before FLB becomes undersecured. The Court will give the debtors the benefit of the doubt, at this time, and deny relief from stay.

THIS MEMORANDUM SHALL CONSTITUTE MY FINDINGS OF FACT AND CONCLUSIONS OF LAW UNDER BANKRUPTCY RULE 752 AND RULE 52 OF THE FEDERAL RULES OF CIVIL PROCEDURE.