**In the Matter of McMARTIN INDUSTRIES, INC., Debtor.**

**Bankruptcy No. BK85–1190.**

United States Bankruptcy Court, D. Nebraska.

Jan. 3, 1986.

Richard Anderl and Randall Wright of Dixon, Dixon and Minahan, P.C., Omaha, Neb., for moving party.

Paul Festersen of Paul F. Festersen, P.C., Omaha, Neb., for debtor and debtor-in-possession.

MEMORANDUM OPINION AND ORDER RE MOTION FOR RELIEF FROM AUTOMATIC STAY FILED BY CONGRESS FINANCIAL CORPORATION, INC.

TIMOTHY J. MAHONEY, Bankruptcy Judge.

This motion for relief from stay filed by Congress Financial Corporation, Inc., was heard on November 5 and 6, 1985.

### Decision

The motion for relief is granted pursuant to § 362(d)(1) for cause.

### Findings of Fact

1. McMartin Industries, Inc., is a manufacturer of electronic products including satellite broadcasting equipment, radio receiving equipment, AM and FM transmitters, consoles, monitors and public address amplifiers, among other things.

2. On May 24, 1985, an involuntary petition under Chapter 7 was filed against McMartin Industries, Inc., and on September 13, 1985, McMartin Industries, Inc., filed a voluntary petition under Chapter 11 of the Bankruptcy Code.

3. After the filing of the involuntary petition, but before the filing of the voluntary petition, a creditor, Congress Financial Corporation, Inc., (Congress), filed a number of pleadings and motions, including a motion for the relief from the automatic stay, alleging that the stay should be lifted

because McMartin Industries, Inc., (McMartin), had used cash collateral of Congress, both before and after May 24, 1985, without permission of Congress, the secured creditor. Congress argues that such use was in direct violation of the security agreements and relief should be granted for cause. Hearing was held and relief was granted for cause. McMartin then filed a motion for reconsideration claiming that the filing of an involuntary petition does not automatically invoke the cash collateral use prohibitions of the Bankruptcy Code and that McMartin was permitted, until an order for relief was entered, to continue "business as usual". McMartin further argued that since it was permitted under the Code to continue business as usual, it should not be punished for doing so by the granting of relief from the automatic stay for cause.

The Court granted the motion for reconsideration and set the motion for relief for an evidentiary hearing on November 5 and 6, 1985.

4. Congress has a valid and enforceable perfected security interest in the equipment, inventory and accounts receivable of McMartin.

5. At the time of the final relief hearing on November 5 and 6, 1985, McMartin owed Congress approximately $566,000.

6. The value of the collateral securing the debt is $646,000. This value is determined by accepting the valuation placed upon the equipment by the appraiser for McMartin and McMartin's evidence of the value of accounts receivable, finished goods, and the Court's estimate of work in process.

Although the testimony of the appraiser was somewhat confusing, he did admit that the liquidation value of the equipment was $644,000 assuming an orderly liquidation and 40 to 50% of that amount assuming a forced liquidation. This Court accepts 50% of $644,000 as the forced liquidation value of the equipment or $322,000. The moving party also presented evidence of value of the equipment. However, the moving party failed to present the person who per-

formed the appraisal and, although the movant's witness testified that the equipment was worth $110,000 to $125,000, the evidence presented by McMartin is more convincing.

Accounts receivable are valued at $40,000, the approximate amount the debtor believes can be collected as shown by its offer of adequate protection.

Finished goods are valued at $159,000 which is the value of those goods if sold in the ordinary course of business.

Work in process as of October 31, 1985, is valued at $125,000. Mr. Ray McMartin, president and chief stockholder of the corporation, testified concerning Exhibit 8 which was a reconciliation of work in process inventory. He attempted to explain that the value of the work in process at cost, including the expenditure of additional labor and raw materials, was $672,917. However, evidence throughout the hearing was that the inventory records were incomplete and that the "work in process" would have very little value unless additional raw materials and labor were expended to complete the product. Mr. McMartin speculated that after adding thousands of dollars in labor costs and raw material costs plus adding in an overhead factor, the "cost" of the work in process would be approximately $673,000. These numbers are simply not accepted by this Court. All of them are speculative and are based upon numbers that have no underlying basis. The records are incomplete. After adding in imaginary raw material and labor costs and deducting work orders completed between January 1, 1985, and October 31, 1985, Mr. McMartin estimates that the value of the work in process as of October 31, 1985, is approximately $400,000. Since no evidence was presented to show how additional labor or materials are to be purchased or paid for, this Court accepts the fact only that there is some value to the work in process because the Court accepts for the purpose of this hearing the theory that the business is capable of reorganization and will be reorganized. Therefore, it will continue in business and the work in process does have

value. However, this Court will take only a percentage of the estimate presented by Mr. McMartin and will value the work in process at $125,000.

Adding the value of the equipment, accounts receivable, finished goods and work in process, the Court finds that the value of the collateral is $646,000.

7. Between May 24, 1985, and September 13, 1985, McMartin had thousands of dollars in sales, including $21,000 in June, $65,000 in July, $65,000 in August, and a total of $87,000 in September, some of which came prior to September 13, 1985. Some of the inventory on hand on May 24, 1985, was used to generate these sales. Therefore, the proceeds of the sales, at least to some extent, are cash collateral and should have been accounted for by McMartin to the secured creditor. In addition, Mr. Ray McMartin claims that $20,000 to $40,000 in accounts receivable were collected from Mexico in June and July of 1985 and raw materials were purchased with those funds. If such monies actually did come from customers in Mexico, such funds were receivables and were covered by the security interest of Congress.

8. Prior to May 24, 1985, McMartin set up a separate checking account in the name of Communi-Quik, Inc., at a bank which was not the normal depository of the corporation. Prior to May 24, 1985, McMartin placed collected receivables in the account and did not inform Congress of the existence of the account and did not account for the receivables. After May 24, 1985, McMartin continued to place collected receivables in the account and did not inform Congress of the existence of the account and did not pay over any of the funds to Congress.

On September 13, 1985, McMartin filed its petition for relief under Chapter 11 and filed its schedules. It did not list the account on the schedules and did not inform Congress of the existence of the account until Congress discovered the account in October of 1985. As of the date of the hearing on this matter, McMartin had not amended its schedules to reflect the existence of the account or the balance in the account on September 13, 1985.

9. McMartin naturally resists the motion of Congress and claims that Congress is adequately protected. McMartin alleges that cash collateral has, since September 13, 1985, been placed in a separate collateral account and an accounting has been provided to Congress. In addition, Congress has purchased at a sale held by a trustee under a Deed of Trust the manufacturing facility and, based upon the difference between the first lien and the price paid by Congress, Congress has been benefited by approximately $189,000. In other words, the debt to Congress has been reduced by approximately $189,000 since September 13, 1985.

McMartin offers as additional adequate protection, the following:

A. An immediate payment of the special cash collateral account in the amount of $1,574.

B. McMartin and Congress should write a joint collection letter to accounts receivable and McMartin estimates that $40,000 to $50,000 will be collected.

C. McMartin claims to have pending or possible litigation by which McMartin may obtain recovery from third parties. McMartin offered to permit Congress to pursue such litigation at the cost of Congress with all recoveries being payable to Congress.

D. McMartin proposes to move its business to Colorado and to sell fixed assets including machinery and equipment to an Economic Development District in Colorado. McMartin will pay the net proceeds of such purchase to Congress when received and it expects to receive $50,000 upon the delivery of the assets and the balance of the total of $176,000 in semi-annual installments over eighteen months. In addition, McMartin plans to receive a loan from a Colorado bank and will pay Congress between $100,000 and $125,000 from the proceeds of such loan. Finally, all inventory and equipment not moved to Colorado will be surrendered to Congress and McMartin

**722**

estimates that the net proceeds from the sale of such inventory and equipment would be approximately $75,000. If, after all of such payments, there is still a balance owing to Congress, McMartin proposes to pay such balance in monthly installments plus interest over three years beginning February 1, 1986, and to secure the balance with a continuing lien on its accounts and inventory junior to that of the Colorado bank.

10. After the Court granted Congress the relief from stay at the preliminary hearing ·and before the hearing at which the Court set a final evidentiary hearing, Congress and McMartin entered into a stipulation and agreement whereby McMartin agreed to account for all cash collateral arising from the sale, use or other disposition of collateral collected or received by McMartin on or after September 13, 1985, and in addition McMartin agreed to account to Congress as to the extent and condition of the collateral as of May 24, 1985; to account for the use, sale, or other disposition of the collateral, including without limitation any and all cash proceeds of the collateral collected or received from McMartin on or after May 24, 1985, and prior to September 13, 1985. As consideration for such agreement and compliance with such agreement, Congress agreed to take no further action to prosecute an adversary proceeding that it had filed and agreed to withdraw without prejudice its emergency application seeking a preliminary injunction with regard to the use of collateral. A copy of the stipulation and agreement was attached to McMartin's Exhibit No. 2 which was the Offer of Adequate Protection.

11. McMartin did not comply with the stipulation referred to above in that it failed to notify Congress of the existence of the Communi-Quik account either at the time the stipulation and agreement was signed, September 30, 1985, or at any other time until Congress, through its own investigation, discovered the existence of the account and discovered that approximately $240,000 had been run through the account since May of 1985.

12. As of the date of hearing, McMartin owed employee withholding and other payroll type taxes to the United States Government and to the State Government accruing since September 13, 1985, in the amount of approximately $15,500. Pre-September 13, 1985, state employee payroll taxes amounted to approximately $17,000 and pre-September 13, 1985, federal withholding taxes amounted to over $20,000.

*Conclusions of Law*

On motion for relief from automatic stay pursuant to § 362(d)(1) and (2), the moving party has the burden of proof on the issue of the debtor's equity in the property and the debtor has the burden of proof on all other issues, including the issue of whether or not the property is necessary to an effective reorganization, whether the secured party's interest in the collateral is adequately protected and for showing that there is no cause for relief. See § 362(g). Congress has failed to meet its burden with regard to the question of equity. Congress presented evidence that the equipment in which it has a security interest is worth from $110,000 to $125,000. However, Congress failed to present any evidence with regard to the value of the raw material, work in process or finished goods, other than to state that upon liquidation such inventory is worth only a small percentage of its original cost. No evidence was presented concerning its original cost.

On the other hand, McMartin presented evidence by oral testimony of an appraiser that the equipment, accounts receivable and inventory, using a combination of liquidation value, going concern value and discounting the accounts receivable, exceeded the amount of the debt.

Since the creditor failed to meet its burden of proof on the issue of equity, relief shall not be granted pursuant to § 362(d)(2).

With regard to the request for relief from the stay pursuant to § 362(d)(1), since

the debtor has equity in the collateral, and there was very little, if any, credible evidence that the value of the collateral is decreasing, the creditor is adequately protected by the equity cushion.

 However, § 362(d)(1) provides that relief can be granted for cause, with cause not being limited to the question of adequate protection. This Court believes that failure to pay state and federal withholding taxes from May 24, 1985, through September 13, 1985; failure to pay state and federal taxes from September 13, 1985, through the date of the hearing, November 5 and 6, 1985; and failure to list the Communi-Quik account on the schedules filed September 13, 1985, or to notify the secured creditor of the existence of such an account even after McMartin agreed to account for all collateral by agreement entered into on September 30, 1985, shows a sufficient disregard for the law and the rights of the secured creditor to be considered cause under the appropriate section of the Code.

At the original preliminary hearing in the summer of 1985, the Court considered the continuing use of Congress' collateral without permission of Congress to be sufficient cause for granting relief from the automatic stay. McMartin was successful in convincing the Court that such an interpretation, prior to the entry of an order for relief was not appropriate. McMartin claimed that it could continue to operate its business in the manner that it saw fit even if such manner was a violation of the security agreement with the creditor. However, even after convincing the Court that September 13, 1985, was the significant date to be looked at by the Court, McMartin continued to hide information from the secured creditor and to hide it from the Court.

It does not matter to this Court that the amount of money in the Communi-Quik account from September 13 forward was relatively insignificant. It does matter to this Court that the officers and directors of McMartin Industries, Inc., did not think that the September 13, 1985, filing of a petition for relief and schedules was signif-

icant enough to be perfectly honest. Apparently it was "business as usual" for McMartin with regard to Congress after September 13 and it apparently did not even occur to the officers and directors of McMartin that the status of the corporation changed on September 13, 1985, and that it was required by law to be truthful and complete both with regard to its dealings with the secured creditor and with regard to its dealings with the Court.

The corporation's failure to pay payroll taxes when due, failure to schedule assets, and failure to deal fairly as a debtor-in-possession with the secured creditor after September 13 and specifically after September 30, 1985, is deemed by this Court to be cause for granting the creditor relief from the automatic stay.