**In re O. Walter JOHNSON, Debtor.**

**Bankruptcy No. 4-88-2424.**

United States Bankruptcy Court,
D. Minnesota.

Sept. 12, 1988.

Barbara G. Stuart, Moss & Barnett, Minneapolis, Minn., for debtor.

Hart Kuller, Winthrop & Weinstine, St. Paul, Minn., for American National Bank.

## MEMORANDUM OPINION AND ORDER

NANCY C. DREHER, Bankruptcy Judge.

Debtor's petition for relief under chapter 11 of the Bankruptcy Code was filed on June 17, 1988. American National Bank & Trust Co. ("the Bank") filed its motion for relief from the automatic stay imposed by 11 U.S.C. § 362 and for a determination of fully secured status on July 29, 1988. A preliminary hearing was held on August 17, 1988, at which time the court also heard and denied the Bank's motion for interim protection under 11 U.S.C. § 362(f). A final hearing on the Bank's motion for relief from stay was held on August 25, 1988. At the final hearing counsel for the Bank informed the court that the Bank's motion for relief from stay was based solely on 11 U.S.C. § 362(d)(1). On August 29, 1988, this court issued its Order denying the Bank's motion for relief from stay. This Memorandum Opinion and Order records the court's findings and conclusions in support of its decision to deny the Bank relief from stay and also addresses the motion for determination of secured status.

### FACTS [1]

Debtor is an individual engaged in a substantial number of real estate investment ventures and enterprises. His personal wealth was accumulated as founder and chief executive officer of Connco Shoes, Inc., a locally based chain of shoe stores. The filing of debtor's petition for relief was precipitated by difficulties incurred in one of the real estate ventures; namely, Metro Square, which is an office building and commercial development located in downtown St. Paul, Minnesota. In May of 1988, the partnership which owns and operates Metro Square defaulted in payment on its liabilities incurred in connection with that development. The default triggered a $10 million guaranty signed by the debtor as a general partner in Metro Square. Metro Square filed for relief under the Bankruptcy Code on May 25, 1988. Unable to meet the demand on his guaranty, debtor sought protection under chapter 11 on June 17, 1988.

One of debtor's other real estate ventures was Oak Glen Development Company, a Minnesota limited partnership ("Oak Glen"). Debtor is a general partner of Oak Glen. Oak Glen owns and is developing a residential and recreational project located in Stillwater, Minnesota, consisting of 486 residential lots with an 18–hole golf course. Oak Glen has not filed for relief under the Bankruptcy Code.

On May 1, 1987, the Bank and Oak Glen entered into a revolving credit agreement pursuant to which the Bank agreed to extend a line of credit to Oak Glen in the sum of up to $1.5 million. At the same time, Oak Glen executed a revolving note pursuant to which it agreed to repay the advances with interest at a rate which fluctuated with prime. The note was due on demand. Further, in connection with this transaction, four partners in Oak Glen, including debtor, signed unconditional guarantees of the indebtedness. The guarantees specifically allowed the Bank to call the guarantees, without having first made demand on Oak Glen or other collateral. Debtor also pledged 143,632 shares of stock in Apogee Enterprises, Inc. ("the Apogee stock"), and, in connection therewith, entered into a pledge agreement which is the subject of this motion for relief from stay pursuant to which the Bank received a first priority secured interest in the Apogee stock.

In the pledge agreement, debtor agreed to deliver possession of stock certificates free from all restrictive legends and fully disposable except as limited by Rule 144 of the Securities Act of 1933. Paragraph 8 of the pledge agreement provided the Bank, at any time, with the right to sell all or any of the Apogee stock on five days written notice in order to bring to 1.2:1.0 the ratio of the market value of the Apogee stock to the outstanding principal balance of the note. Notice was not necessary if the market value of the Apogee stock was "de-

---

**1.** The court has considered all evidence adduced at the hearing on August 17, 1988, in addition to that presented at the final hearing on August 25, 1988.

creasing significantly or rapidly as determined by [the Bank] in its sole discretion." Debtor had the right to deliver additional collateral acceptable to the Bank in order to avoid such immediate sale. Paragraph 9 of the pledge agreement also provided that once demand was made on the note, the Bank had all rights and remedies available to it as a secured lender under the Uniform Commercial Code, including the right, after five days notice (or not, if the stock was decreasing significantly or rapidly in value) to dispose of the Apogee stock "without liability for any diminution in price ... in such manner and for such a price as [the Bank] may determine."

Oak Glen is in default under the note and the revolving credit agreement. The Bank has, as a consequence and as a matter of right, demanded payment in full, plus accrued interest and attorneys fees incurred in connection with the collection efforts. On June 17, 1988, the outstanding and unpaid principal on the note was $1,112,-500.00. Interest accrues at the rate of $355.38 per day. To August 25, 1988, the date of the hearing, accrued interest amounted to $38,350.36. The Bank has incurred attorneys fees in pursuing its rights for which it makes claim in an unspecified amount.

Debtor is a member of the Board of Directors of Apogee Enterprises, Inc. ("Apogee"). He owns approximately 435,000 shares of Apogee stock, only 143,652 of which are pledged to the Bank and the remainder of which, for the most part, are pledged to several other Banks and financial institutions. No creditor holding Apogee stock as collateral, other than the Bank, has moved for relief from stay.

The evidence presented at the initial and final hearing revolved in large measure around the value of the Apogee stock, the Bank's claim that the Apogee stock is declining precipitously in value, and the debtor's claim that the Apogee stock is declining not at all, but rather is increasing, thus providing a substantial equity cushion which is more than sufficient to constitute adequate protection.

The Bank's evidence focused almost entirely on the current fluctuations in the market price for Apogee stock which is traded on the over-the-counter market. On the date the bankruptcy petition was filed, Apogee stock was at $13⅛ per share resulting in a total market value of the Apogee stock of $1,885,170.00; the ratio of current value of the pledged shares to the aggregate outstanding and unpaid principal balance due on the note being approximately 1.69:1.00. On July 28, 1988, the date the pending motion was filed, the stock was still at $13⅛ and the same ratio. Closing prices at subsequent dates deemed significant by the Bank are:

| | |
|---|---|
| August 12 | 12⅛ |
| August 15 | 12⅜ |
| August 16 | 11½ |
| August 17 | 10⅝ |
| August 18 | 10⅝ |
| August 19 | 10⅞ |
| August 22 | 10¾ |
| August 23 | 10 |
| August 24 | 10¼ |

On the day of final hearing, August 25, Apogee stock opened at 10. The ratio of market value to aggregate outstanding principal balance due on the note as of August 24, 1988 had fallen from 1.69:1.0 to 1.25:1.0, dangerously close, in the Bank's view, to the bargained for ratio of 1.2:1.0. The 52 week trading range as of July 1988 was 7½ to 13⅞. The stock price, as did virtually all stock prices, fell to its low ebb during mid-October 1987.

The Bank's expert testified that the drop in stock price was not, in his view, attributable to general market conditions; rather Apogee stock on some days was declining while the market, in general, was on an upswing. He also testified that Apogee stock has experienced extremely high trading volumes in the first few weeks of August 1988. He further testified that the drop in Apogee stock price "could be" caused by the fact that the investment community has now become aware of the fact that Apogee's second quarter earnings report (as of August 31, 1988) would contain "some disappointment" which would "fly in the face of expectations" previously reported regarding a stronger quarter. These reports, he said, could already have

been the cause of the stock's decline by approximately $3.00 per share, and could further impact the market when second quarter results were officially released in September. Other causes which he believed "could be" causing the stock decline were the fact that as a result of debtor's bankruptcy the market knows that there is an "overhang" of debtor's block of approximately 500,000 shares, including the pledged shares, and/or the fact that there have been recent reports of insider trading. He discounted, however, the "overhang" factor as not having any "significant impact on the value" of the stock.

Nonetheless, on cross examination, the Bank's expert acknowledged that the market value fluctuations experienced in August 1988 were not abnormal, though daily fluctuations such as these being experienced were "somewhat unusual." He also asserted that the company was fundamentally very strong, and its outlook is very good. In fact, the Bank's expert is so pleased with the company's performance and its outlook that he has been recommending that the board of directors of his own company purchase Apogee stock throughout this period of time. Such recommendations are based on his expectation that the price of Apogee stock will rise and that it will produce dividends. Despite expected flat second quarter earnings, he is still very positive on the stock, views the current decline as a "temporary" situation, and expects year end earnings per share to closely approach or reach the $1.00–$1.05 per share originally anticipated. His company has, in fact, made it known to the Bank that it would be interested in purchasing the Apogee stock at a price only slightly off market should the Bank receive the authority to sell it as a result of this motion.

It is the Bank's position that what it describes as a dramatic (approximately 20%) drop in the value of the shares, from July 28, 1988 to August 24, 1988, and the decline in its protective ratio from 1.69:1.0 to 1.25:1.0, is cause to lift the stay under section 362(d)(1). According to a Bank officer, the Bank bargained for a ratio to protect itself against the very fluctuations in value in its collateral that are being experienced. The Bank has not been receiving payments from Oak Glen, and, after demanding payment of the four guarantors, has received no positive response from any of them, including this debtor who is obviously involved in his own bankruptcy proceedings. The Bank believes, based on conversations with local brokerage houses, that if the stay is lifted with respect to the pledged shares, it could sell the Apogee stock in a block at a modest discount off current market. Should the court lift the stay, it is fairly clear that the Bank would exercise its right to sell the shares in a block (if it deemed that to be prudent) and to argue later with the debtor whether the sale of the collateral complies with paragraph 9 of the pledge agreement, was performed in a commercially reasonable manner, or was sold in compliance with Rule 144.

Debtor presented expert evidence, much of which was confirmed by the Bank's own experts, demonstrating that Apogee stock, if viewed on something other than a daily, short term basis, is very strong. Apogee is in several businesses, one of which is commercial construction, for which it supplies glass curtain walls. It is the largest installer of high rise commercial curtain walls in the United States. Its commercial construction division has tripled its backlogs in the last eighteen months. In market data research prepared before the bankruptcy, Piper, Jaffray & Hopwood gave Apogee its second highest buy recommendation; since that time, independent of these proceedings and based on perceived continuing strength of the stock, Piper Jaffray has raised that buy recommendation to its highest available one. Apogee's revenues have increased significantly over the last several years, as has net income. Sales for fiscal year ending February 28, 1989 are projected at $391.5 million, a 25% increase over the previous year. This was before Apogee received a $36 million contract for construction work in London, a geographic market it only recently entered. Earnings per share have risen steadily from $.62 per share in 1986 to an estimated $1.00 to $1.05

per share in 1989. Its three other businesses, engaged in wholesale and retail glass replacement, glass fabrication, and the manufacture of high performance aluminum windows, etc., are also fairly strong. While the commercial construction business tends to be somewhat volatile, there is evidence to demonstrate that Apogee is doing much better than its competitors in controlling volatility. Management appears to be strong and respected. These developments have increased Apogee's sponsorship in the market; it is receiving more favorable press and increased attention from the investment community.

According to debtor's experts, expected "flat" second quarter earnings at approximately $.26 per share have had only an "indeterminate" effect on the price of the stock. This is because the company is basically strong and has recently demonstrated an ability to successfully move into a new geographic market. Debtor's experts believe that the "flat" second quarter earnings are more the product of the somewhat volatile nature of the construction business than a signal portending future decline. Apogee stock is, in their view, definitely not in "free fall", as urged by the plaintiff. Rather, the price swings recently experienced are temporary aberrations, due, not to any basic flaws in the company or decline in its value, but rather to the market's uncertainty as to the manner in which debtor or his creditors, should they be allowed to do so by this court, will dispose of the debtor's stock which remains a key asset in his reorganization.

There was evidence presented to show that by allowing the Bank relief from stay would negatively impact the price of the debtor's remaining Apogee stock (and thus his remaining secured creditors who hold Apogee stock as collateral) as well as frustrate the ongoing reorganization efforts. There are 13.46 million shares of outstanding Apogee stock; debtor's shares thus representing approximately 3% of that amount. According to the debtor and his experts, disorderly liquidation of his Apogee stock, such as that which might occur should the Bank or its immediate purchaser sell a large block of Apogee stock followed by a similar action by other creditors, would likely artificially depress the price of all shares owned, not only by the debtor, but also by the public. The better route, one which may even produce some equity for unsecured creditors, is to sell all of debtor's shares as part of an orderly liquidation based on advice and consultation with professional investment bankers and brokers. Debtor has, in the past, liquidated large holdings in Apogee stock in just such an orderly fashion without artificially depressing the market; he is currently working with several respected brokers and investment bankers to formulate a plan for doing so in connection with this bankruptcy. There are several different scenarios which could be played out to accomplish the end of preserving the highest value for the Apogee stock while accomplishing what debtor needs to do in order to reorganize. Debtor expects that an orderly plan can be formulated within the next 60 days and he has taken affirmative steps to accomplish that end.

## DISCUSSION

### A. Relief From Stay

The Bank urges that it is entitled to relief under 11 U.S.C. § 362(d)(1) under one or two alternative theories. First, the Bank asserts that it is entitled to adequate protection of the entire value of the collateral as of the date it filed its motion for relief from stay (i.e., $1,885,170.00) and that it is not adequately protected because the security is depreciating in value. 11 U.S.C. §§ 361(1) and 362(d)(1); *United Savs. Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, — U.S. —, 108 S.Ct. 626, 629, 98 L.Ed.2d 740 (1988). Second, the Bank asserts that the substantial equity cushion present until recently does not now provide adequate protection because that cushion is rapidly deteriorating as a result of significant market declines and accruing postpetition interest and attorney's fees.

Debtor counters that there has been no decline in the value of the collateral, rather its intrinsic value is increasing, and the Bank is therefore not entitled to adequate

protection. Secondly, debtor argues that the Bank is adequately protected by reason of the existence of a significant equity cushion.

I have concluded that the value of the Bank's collateral is not declining, but is rather probably increasing. I also conclude that the equity cushion which still exists and other factors provide adequate protection to the Bank.

### 1. The Value of the Apogee Stock

According to 11 U.S.C. § 362(d)(1) a creditor is entitled to relief from the automatic stay of § 362(a) "for cause, including the lack of adequate protection of an interest in property of such party in interest...." 11 U.S.C. § 362(a)(1). The "interest in property" that is protected is the "value of the collateral." *See* 108 S.Ct. at 629–30. Section 361(1) further provides that, during the pendency of the proceedings, the Bank is entitled to receive adequate protection in the form of recompense for a decline in the value of the collateral resulting from imposition of the stay:

> It is common ground that the interest in property referred to by section 362(d)(1) includes the right of a secured lender to have the security applied in payment of the debt upon completion of the reorganization *and that interest is not adequately protected if the security is depreciating during the term of the stay.* Thus, it is agreed that if the apartment project in the case had been declining in value petitioner would have been entitled, under section 362(d)(1) to cash payments or additional security in the amount of the decline, as section 361 describes."

*Timbers,* 108 S.Ct. at 629–30 (emphasis added).

■ Based on substantial evidence I find that value of the Apogee stock which serves as collateral for the Bank's secured

indebtedness has not declined in value during the pendency of these proceedings. Since the value of the collateral has not declined, the Bank is not impaired by reason of the stay and is not entitled to receive adequate protection. *See In re Pine Lake Village Apartment Co.,* 19 B.R. 819, 826 (Bkrtcy.S.D.N.Y.1982).

In reaching the conclusion that the value of the Bank's collateral has not declined, I have taken a view which is long term rather than short term. Unlike other types of collateral typically seen in reorganizations (such as real estate), stock prices change from day to day. Between the filing of the petition for relief and the date of hearing the price of Apogee stock dropped from 13⅛ to 10¼. While downward fluctuations cannot be prudently ignored, they do not compel a conclusion that the value of the Apogee stock being held by the Bank has depreciated, especially since there is credible evidence that the decline in daily market price is attributable to a temporary factor wholly unrelated to the underlying soundness of the company, i.e., the "overhang factor." There is ample evidence to support the conclusion that the depression in trading price in the first few weeks of August was solely attributable to the "overhang" factor and that, as one of debtor's experts testified, once the court proceedings dispel the uncertainty in the market over what will happen to debtor's block of shares, the market should respond positively.[2]

Valuation of collateral in the context of §§ 361 and 362 of the Bankruptcy Code is not an exact science; under Congressional directive, each case must be decided on a case by case basis with attention given to the particular facts of the case. H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 339, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5963, 6295; *First Nat'l Bank of McDonough v. Schockley Forest Indus.*

---

**2.** The day after this court denied the Bank's motion for preliminary relief under § 362(f), thus providing some additional certainty to the market, the stock rose ½ a point; shortly after the court issued its opinion of August 29 denying relief from stay, the stock rose again by 1 point, or thereabouts; the closing price on Apo-

gee stock on Friday, September 9, was 11⅝. While these events may not be tied exactly, they do provide some support for the debtor's argument regarding market overhang and the market's keen awareness of what is happening in these reorganization proceedings.

(*In re Schockley Forest Indus.*, 5 B.R. 160, 162 (Bktcy.N.D.Ga.1980); *Heritage Savs. & Loan Ass'n. v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679, 683–84 (Bktcy.E.D.Va.1980). This record supports the court's conclusion that, if sold in a commercially reasonable fashion (which is the commonly used standard), *see Rogers*, 2 B.R. at 684, the Apogee stock would draw a much higher price than the price at which it was trading on the day of the hearing.

### 2. Adequate Protection

I also conclude that the Bank has more than enough adequate protection in the substantial equity cushion which existed on the day of the hearing.[3]

Adequate protection, which is derived from the fifth amendment protection of property interests of both the debtor and creditor, reconciles the competing interests of the debtor and creditor. *Federal Land Bank v. Carson (In re Carson)*, 34 B.R. 502, 505 (D.Kan.1983). By providing the creditor with a method of protection for the creditor's interest, the debtor is allowed to continue its reorganization efforts. *See id.* Given the complexities and variations in debtor/creditor relations, adequate protection is a flexible concept, and its meaning therefore is derived from a case-by-case interpretation. *See Bankers Life Ins. Co. of Neb. v. Alyucan Interstate Corp. (In re Alyucan Interstate Corp.)*, 12 B.R. 803, 805 (Bktcy.D.Utah 1981). Most courts consider a number of factors in determining whether a secured creditor's interest is adequately protected, such as equity; necessity of property to an effective reorganiza-

tion; ability to pay interest or give replacement liens or indubitable equivalents; and the debtor's care in keeping property insured and repaired. *See, e.g., Carson*, 34 B.R. at 505–06; *Metropolitan Life Ins. Co. v. Monroe Park (In re Monroe Park )*, 17 B.R. 934, 940–41 (D.Del.1982); *Alyucan*, 12 B.R. at 811–12 (Bktcy.D.Utah 1981); *Sanders v. Tucker (In re Tucker )*, 5 B.R. 180, 182–83 (Bktcy.S.D.N.Y.1980).

The primary factor in determining the existence of adequate protection in this case is the existence of an adequate equity cushion. Although not specifically mentioned in 11 U.S.C. § 361, it is the classic protection for secured debt justifying continuation of the stay. An equity cushion is the value in the property above the amount owed to the creditor with a secured claim that will protect the creditor's secured interest from decreasing in value during the period that the automatic stay remains in effect. *E.g., In re Mellor*, 734 F.2d 1396, 1400 (9th Cir.1984); *First Agricultural Bank v. Jug End In The Berkshires, Inc. (In re Jug End In The Berkshires, Inc.)*, 46 B.R. 892, 899 (Bktcy.D.Mass.1985). Many courts find that a creditor's interest is adequately protected if the value of the security alone exceeds the amount of its claim by a sufficient amount. *See, e.g., Mellor*, 734 F.2d at 1400; *In re Helionetics, Inc.*, 70 B.R. 433, 440 (Bktcy.C.D.Cal.1987); *Asquino v. Palmer River Realty Inc. (In re Palmer River Realty Inc.)*, 26 B.R. 138, 141 (Bktcy.D.R.I.1983); *City Nat'l Bank v. San Clemente Estates (In re San Clemente Estates )*, 5 B.R. 605, 610 (Bktcy.S.D. Cal.1980); *Tucker*, 5 B.R. at 182.[4] Other

---

**3.** Since the stock price has risen since August 25, there is an even greater equity cushion now than there was on the day of the hearing.

**4.** There is a contrary view to the effect that an otherwise sufficient cushion may not adequately protect the creditor if the cushion is being eroded by accruing interest or depreciation. *See Metropolitan Life Ins. Co. v. Monroe Park (In re Monroe Park )*, 17 B.R. 934 (D.Del.1982); *Ingersoll–Rand Fin. Corp. v. 5–Leaf Clover Corp. (In re 5–Leaf Clover Corp.)*, 6 B.R. 463 (Bktcy.S.D.W. Va.1980); *Heritage Savs. & Loan Ass'n v. Rogers Dev. Corp. (In re Rogers Dev. Corp.)*, 2 B.R. 679 (Bktcy.E.D.Va.1980); *Vlahos v. Pitts (In re Pitts )*, 2 B.R. 476 (Bktcy.C.D.Cal.1979). *But see In re Morysville Body Works, Inc.*, 86 B.R. 51,

56–57 (Bktcy.E.D.Pa.1988) (although substantial equity cushion exists and it is eroding rapidly, the insubstantial erosion alone does not justify relief from the automatic stay). Some courts reject the equity cushion analysis as alien to the concept of adequate protection. *See In re Hagendorfer*, 42 B.R. 13 (Bktcy.S.D.Ala.), *aff'd* 42 B.R. 17 (S.D.Ala.1984); *Margell v. Bouquet Invs. (In re Bouquet Invs.)*, 32 B.R. 988 (Bktcy.C.D. Cal.1983); *In re Alyucan Interstate Corp.*, 12 B.R. 803 (Bktcy.D.Utah 1981). Those courts have embodied the notion of impairment of lien and have criticized the equity cushion analysis as obscuring the purpose of adequate protection, to guard against impairment of a lien, to the point where it may produce improper re-

courts have articulated an adequate protection standard as:

> whether a secured lender receive[s] 'adequate protection' from a debtor requires an analysis of all of the relevant facts, with a particular focus upon the value of the collateral, [and] the likelihood that it will depreciate or appreciate over time
>
> . . . .

*In re 1606 New Hampshire Ave. Assocs.,* 85 B.R. 298, 309 (Bktcy.E.D.Pa.1988).

Functionally, the equity cushion serves to shield the creditor from the danger that the property will decrease in value during the time the stay remains in effect. *In re Morysville Body Works, Inc.,* 86 B.R. 51, 56 (Bktcy.E.D.Pa.1988). Because of the nature of the equity cushion courts factor into their analysis the chance the cushion will erode. *See, e.g., Heath,* 79 B.R. at 618–19 n. 9 and cases cited therein. The sufficiency of the equity cushion then is a function of the size of the cushion and the rate at which it is being eroded. Several cases faced with this issue have determined that an eroding equity cushion alone is not a sufficient reason to grant relief from the automatic stay. *See Carson,* 34 B.R. at 506; *Heath,* 79 B.R. at 619; *New Ulm State Bank v. Brokmeyer (In re Brokmeyer),* 51 B.R. 704, 706 (Bktcy.S.D.Tex.1985) (although equity cushion eroding rapidly, because there still exists an equity cushion it constitutes adequate protection); *Germantown Savs. Bank v. Keays (In re Keays),* 36 B.R. 1016, 1017 (Bktcy.E.D.Pa. 1984) (eroding equity cushion only one factor); *Ukranian Savs. & Loan Assoc'n v. Trident Corp.,* 22 B.R. 491, 495–96 (Bktcy.E.D.Pa.1982) (slimness of equity cushion one among many factors). *Cf. In re McMartin Indus., Inc.,* 62 B.R. 718, 723 (Bktcy.D.Neb.1986) (where debtor had equity in collateral and there was little evidence the value of collateral was decreasing, creditor was adequately protected by equity cushion).

A sufficient equity cushion in relation to the value and nature of the collateral and the present market forces may preclude an order granting the creditor relief from the automatic stay. Because cases of this type are factually intensive this court will not engage in the mechanistic analysis of "comparity equity cushions" because the end result of whether there is sufficient adequate protection turns upon the facts peculiar to each case. *See In re Heath,* 79 B.R. 616, 618 (Bktcy.E.D.Pa.1987). Rather, it will address the issue considering all factors involved.

In the present case there has been no evidence presented by the bank that there is no equity cushion shielding its collateral. Rather, even taking the stock at its lowest ebb since the petition was filed, the Bank still has an equity cushion of approximately $400,000 to protect a debt currently valued at approximately $1.1 million. The Apogee stock would have to drop to $8 per share for the Bank to completely lose its equity cushion; in the last year, Apogee stock has not been that low except for a brief period of time shortly after the October, 1987 crash or "meltdown." Moreover, Apogee stock has not yet fallen below the 1.2:1.0 ratio contained in paragraph 8 of the pledge agreement. Under the Supreme Court's decision in *Timbers,* the Bank is not necessarily entitled to the full benefit of its bargain with respect to ratios, but only to adequate protection as that term is used in the Bankruptcy Code. *See* 108 S.Ct. at 629–30.

Expert witnesses from both sides testified at length as to the fundamentals of the Apogee company; the type of industry Apogee operates within; and past and future performance of Apogee stock. Neither of the experts testified that the stock is likely to further decline in value, and in fact all were in agreement that there is every reasonable expectation the stock will increase in the future. Those experts also testified they were advising their clients to buy Apogee stock at this time. Upon reflection of the expert testimony in this case, this court is of the opinion that the market temporarily reacted to the bank's motion by driving the price of Apogee stock down. At no point, however, was the

sults. This court agrees with the majority of cases which utilize the equity cushion analysis.

existing equity cushion eroded to a point where it reflected a negative value. Given the fact there is an equity cushion present this court will not speculate as to the future effect of sour market conditions or potential sudden declines in market value, all of which are beyond this court's control. *See Layne v. Omni/Co Inc. (In re Omni/Co Inc.)*, 17 B.R. 140, 142 (Bktcy.S. D.Ohio 1981).

There are other factors, in addition to the existence of an equity cushion, which support a denial of the request for relief from stay. First, based upon the expert testimony received during the preliminary and final hearings, an orderly liquidation on behalf of the debtor of the stock will maximize the return for the debtor and benefit all creditors without prejudicing the interests of the bank. *See In re Penny*, 52 B.R. 816, 820–21 (Bktcy.E.D.N.C.1985). Second, granting this motion could artificially depress the price of stock held by the investing public. Third, it is apparent that Apogee stock is necessary for debtor's reorganization and granting relief from stay at this point would completely eliminate debtor's attempt to reorganize. Fourth, the debtor has established that its plan of reorganization will not be long in the making and is moving forward in an orderly and expeditious manner. All of these factors positively support the court's decision that the Bank is adequately protected.

### B. Determination of Fully Secured Status

The Bank also requested a determination that its claim is fully secured pursuant to 11 U.S.C. § 506. A determination of secured status is not properly brought by motion but rather can only be obtained through an adversary proceeding. *See* Bankruptcy Rule 7001(2) and (9). At this point the Bank's request is premature because the value of the stock cannot be ascertained in a vacuum. For purposes of ruling on this motion the court need only estimate the value of the stock, which it has done. *See* Bankruptcy Rule 3012.

### ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that:

1. As previously provided in the court's order of August 29, 1988, the Bank's motion for relief from stay is denied.

2. The Bank's motion for a determination of secured status is denied.